DF

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
-------------------------------------------------------------------x

UNITED STATES OF AMERICA

       -against-

RONALD HERRON,

          Defendant.

-------------------------------------------------------------------x

MAR 0 3 2014

**MEMORANDUM & ORDER**

**10-CR-0615 (NGG)**

NICHOLAS G. GARAUFIS, United States District Judge.

## I.    BACKGROUND

### A.    Charged Criminal Conduct

Defendant is charged by a twenty-three count indictment with leading a racketeering enterprise between approximately January 1998 and October 2010, responsible for the commission of murder, attempted murder, robbery, extortion, assault, and narcotics trafficking. (Superseding Indictment (Dkt. 217).) The alleged criminal organization was comprised primarily of individuals residing in and around the Gowanus public housing developments in the Boerum Hill section of Brooklyn. (Id.)

Defendant is charged with participating in racketeering and racketeering conspiracy (Counts 1 and 2); conspiracy to distribute cocaine base (Count 3); unlawful firearms possession in furtherance of narcotics conspiracy (Count 4); the murder of Frederick Brooks (Counts 5-8); robbery of narcotics and narcotics proceeds (Count 9); unlawful firearm possession in furtherance of robbery (Count 10); conspiracy to distribute heroin (Count 11); the murder of Richard Russo (Counts 12-15); the attempted murder of John Doe # 4 (Count 16); the conspiracy

to murder and murder of Victor Zapata (Counts 17-21); and two counts of possession of a firearm (Counts 22-23). (Superseding Indictment.)

## B. Procedural History

On August 23, 2013, the Government moved for an anonymous and semi-sequestered jury. (Gov't Mem. in Supp. of Mot. for Anon. Jury ("Gov't Jury Mot.") (Dkt. 362).)

By written motion dated November 5, 2013, Defendant made an Omnibus Pre-Trial Motion, seeking to suppress a body armor vest seized from his person and seeking discovery of a variety of information from the Government. (See Def. Mot. (Dkt. 378).) On January 3, 2014, Defendant also moved to suppress historical cell-site information obtained pursuant to a court order. (See Def. Mot. ("Def. Cell-Site Mot.") (Dkt. 386-1).)

The court heard oral arguments on these three motions on February 14, 2014. The court granted the Government's Motion for an Anonymous and Partially Sequestered Jury, ordered that an evidentiary hearing will be held on Defendant's motion to suppress the body armor, and reserved decision on Defendant's motion to suppress historical cell-site data. (See Feb. 14, 2014, Min. Entry.) This Memorandum and Order sets forth the court's reasoning in connection with the Government's Motion for an Anonymous and Partially Sequestered Jury and addresses Defendant's Motion to Suppress Historical Cell-Site Information.

## II. ANONYMOUS AND SEMI-SEQUESTERED JURY

### A. Relevant Facts

#### 1. Defendant's Organized Crime Contacts

Defendant is allegedly the leader of a gang comprised of individuals from the Gowanus Houses, including members of the "Murderous Mad Dogs" faction of the Bloods. (Gov't Jury

Mot. at 3.) The gang has been linked to violence and distribution of narcotics in and around the Gowanus Houses. (Id.)

2. Prior Witness Intimidation

In 2001, Defendant was tried in New York State Criminal Court for the murder of Frederick Brooks. (Gov't Jury Mot. at 6.) This alleged murder is charged as Counts Five and Six in the Superseding Indictment in the instant case. (See Superseding Indictment (Dkt. 217) at 11-12.) On the day of the murder, two eyewitnesses gave recorded statements to the Assistant District Attorney, reporting having seen Defendant shoot Brooks in the head in the lobby of a building. (Gov't Jury Mot. at 6-7.) Both witnesses later identified Defendant as the shooter in a police lineup and during testimony before a grand jury. (Id. at 7.) Later the witnesses refused to testify at Defendant's trial, and during material witness proceedings, they recanted their prior statements and stated that Defendant and his associates had threatened them. (Id.) The state court found that Defendant had procured the unavailability of the witnesses and permitted the prosecution to introduce the witnesses' prior statements. (Id. at 7-8.) Defendant was subsequently acquitted of the murder. (Id. at 5.)

3. Local Celebrity

In 2008, Defendant began to distinguish himself as a rap artist under the name "Ra Diggs." (Id. at 8.) He has produced songs and music videos, including some with better known rappers Waka Flocka Flame and Uncle Murda. (Id.) Defendant has also posted multiple videos online, garnering hundreds of thousands of views. (Id.)

This case has also attracted news coverage in major news outlets and blogs such as the *New York Times*, CBS News, the *New York Post*, the *New York Daily News*, the Huffington Post, Gawker, and the *Village Voice*. (Id. at 9.) Media attention has focused on Defendant's 2010

3

indictment on drug charges, his 2012 indictment on murder charges, and the discovery of a cell phone in his solitary confinement cell. (Id. at 9-10.) Due to Defendant's local celebrity, the Government anticipates that the trial will attract substantial public and media attention. (Id.)

**B.     Government's Motion for an Anonymous Jury**

The Government has filed a Motion for an Anonymous and Partially Sequestered Jury, requesting:

> [1] that the names, addresses, and workplaces of members of both the venire and petit juries not be revealed; [2] that the jurors be kept together during recesses and taken to or provided lunch as a group each day during trial; and [3] that [the jurors] be escorted to and from the courthouse each day during trial in a manner to be arranged by the United States Marshals Service.

(Id. at 23.)

1.     Legal Standard

Before empaneling an anonymous jury, a court should "(a) conclud[e] that there is strong reason to believe the jury needs protection, and (b) tak[e] reasonable precautions to minimize any prejudicial effects on the defendant and to ensure that his fundamental rights are protected." United States v. Paccione, 949 F.2d 1183, 1192 (2d Cir. 1991), cert. denied, 505 U.S. 1220 (1992) (citations omitted). "Within these parameters, the decision whether or not to empanel an anonymous jury is left to the district court's discretion." Id.

a.     *Whether a Jury Needs Protection*

Courts in this circuit have considered various factors to determine whether there is a "strong reason" to believe the jury needs protection: (1) the dangerousness of the defendant, (2) whether the defendant or his associates have engaged in past attempts to interfere with the judicial process, (3) whether the defendant has access to the means to harm the jury, and (4) whether the trial is likely to attract media attention and publicity. See United States v. Wilson,

493 F. Supp. 2d 397, 398 (E.D.N.Y. 2006) (Garaufis, J.) (citing Paccione, 949 F.2d at 1192;

United States v. Vario, 943 F.2d 236, 240 (2d Cir. 1991); United States v. Tutino, 883 F.2d 1125,

1132-33 (2d Cir. 1989)). The court has discretion to determine whether an evidentiary hearing is

warranted on the Government's reasons in support of an anonymous jury. United States v.

Aulicino, 44 F.3d 1102, 1116 (2d Cir. 1995).

Courts assess a defendant's dangerousness by the seriousness of the charged crimes,

including whether the defendant is charged with participating in a large-scale criminal enterprise,

and the defendant's criminal history. See, e.g., United States v. Gotti, 459 F.3d 296, 346 (2d Cir.

2006) (noting defendants were charged with membership in an organized crime family); Wilson,

493 F. Supp. 2d at 399-401 (noting defendant was charged with murdering two police officers

and was a member of a violent gang). As for a defendant's past attempts to tamper with the

judicial process, courts look for evidence of previous intimidation, bribing, or violence toward

witnesses or jurors. See, e.g., Aulicino, 44 F.3d at 1116 (noting defendants had an associate

threaten a witness's life and offer $50,000 for the witness's silence); Paccione, 949 F.2d at 1192-

93 (noting government witness had received anonymous, middle-of-the-night phone calls

advising him to "remember[] nothing" and a defendant had threatened others with a baseball bat

and pistol); Vario, 943 F.2d at 240 (noting co-conspirator had approached grand jury witness).

When a defendant is under pretrial detention, whether he has means to harm the jury often hinges

on the extent of his connections outside of prison. See, e.g., Wilson, 493 F. Supp. 2d at 400

(granting a motion for an anonymous jury in part because Defendant was "a member of the

Stapleton Crew and . . . this organization has other members and associates who are currently,

and will be, at large at the time of the trial.") Finally whether the trial is likely to attract media

attention may be illustrated by the nature and degree of pretrial publicity. See, e.g., Paccione,

949 F.2d at 1193 (noting the case had already been "front-page news"); Vario, 943 F.2d at 240 (citing a single *New York Newsday* cover story). Although a defendant's involvement with criminal enterprise is often relevant to these factors, the mere "invocation of the words 'organized crime,' 'mob,' or 'Mafia,' unless there is something more, does not warrant an anonymous jury." Vario, 943 F.2d at 241.

### b. *Reasonable Precautions to Protect a Defendant's Rights*

The Second Circuit has declared that "when genuinely called for and when properly used, anonymous juries do not infringe a defendant's constitutional rights." United States v. Pica, 692 F.3d 79, 88 (2d Cir. 2012), cert. denied, 133 S. Ct. 1582 (2013) (quoting United States v. Quinones, 511 F.3d 289, 295 (2d Cir. 2007)). Two procedures adequately protect a defendant's fundamental right to an unbiased jury during the use of an anonymous jury. First, the court should "conduct a voir dire designed to uncover bias as to issues in the cases and as to the defendant himself." Paccione, 949 F.2d at 1192. To achieve this, courts have often required that the jury selection process include prospective jurors' completion of a detailed questionnaire drafted with defense counsel input. See, e.g., United States v. Pica, 692 F.3d 79, 88 (2d Cir. 2012); United States v. Thai, 29 F.3d 785, 801 (2d Cir. 1994) (finding that the district court's 68-question juror questionnaire created with input from counsel "properly protected defendants' interests"). Second, to reduce possibility that the jury will infer that the defendant is dangerous, the court should give the jurors "a plausible and nonprejudicial reason for not disclosing their identities or for taking other security measures." Paccione, 949 F.2d at 1192; see also Aulicino, 44 F.3d at 1116. In many cases, courts instruct the jury that the additional safeguards are to protect against intrusion by the media. See, e.g., Thai, 29 F.3d at 801; Paccione, 949 F.2d at 1191-92; United States v. Thomas, 757 F.2d 1359, 1363 (2d Cir. 1985).

6

2.    Discussion

    a.    *The Government's Motion*

The Government argues that an anonymous and semi-sequestered jury is warranted for

three reasons: "(1) the seriousness of the charges against the defendant; (2) the potential threat of

corruption of the judicial process; and (3) the expectation of potential publicity." (Gov't Jury

Mot. at 14.) The court finds all three present strong reasons for protection of the jury.

There can be no dispute that Defendant faces a litany of serious charges, including

allegations of holding a leadership role in a violent criminal enterprise. Although the organized

crime status of Defendant, alone, does not merit an anonymous jury, <u>Vario</u>, 943 F.2d at 241, the

charges against Defendant allege his active participation in the enterprise. Among the charges in

the twenty-three count Superseding Indictment are racketeering (Count 1), racketeering

conspiracy (Count 2), three murders-in-aid-of racketeering (Counts 5, 12, 18), one attempted

murder (Count 16), illegal possession and use of firearms (Counts 4, 7, 10, 14, 20, 22, 23),

robbery of narcotics and proceeds (Count 9), and conspiracy to distribute cocaine and heroin

(Counts 3, 11). (<u>See</u> Superseding Indictment.) Combined with Defendant's criminal history,

which includes convictions for armed robbery, narcotics offenses, and weapons possession

(Gov't Jury Mot. at 16), the charges more than demonstrate Defendant's dangerousness.

The court places particular emphasis on the fact that Defendant has previously engaged in

witness tampering, arguably with success, during state prosecution for a murder that is charged

in this case. The Government's submission highlights not only Defendant's history of

interference with the judicial process, as evidenced by the state court witness tampering, but also

his current capacity to do so in this case. Despite Defendant's pretrial detention, Defendant's

alleged role as the leader of a criminal enterprise enables him to corrupt the judicial process

through his associates, and, as the court noted during oral argument, some followers may feel compelled to act on his behalf even without any direction from Defendant. See Pica, 692 F.3d at 85 (District court considered "the ability of the defendant to enlist the resources of the Genovese crime family."). The Government also asserts that it "has learned of credible information that the defendant continues his efforts to intimidate witnesses throughout the Bureau of Prisons and in the streets of Brooklyn by passing threats through other members of the Bloods." (Gov't Jury Mot. at 17.) This possibility of ongoing witness tampering further confirms the court's conclusion that interference with the judicial process is a real risk in this case.

Finally, this case has already received media coverage during significant moments in its pretrial stages—e.g., Defendant's indictments and the discovery of contraband in his solitary confinement cell. Although Defendant argues that the lack of recent media attention demonstrates that interest has abated (Def. Mem. in Opp'n to an Anonymous and Partially Sequestered Jury ("Def. Mem.") at 5), the court finds that with the increased case activity associated with trial, it is reasonable to expect renewed media scrutiny.

b.  *Defendant's Contentions*

Defendant contends that the Government has failed to support its reasons with credible evidence. (Id. at 3.) Defendant argues that the Government did not support its motion with affidavits, documents, or other evidence, falling short of the evidentiary showings made in comparable cases. (Id. at 3-4.) Although Defendant concedes his convictions of several crimes, he contends that the Government improperly relies on "unproven allegations in the indictment," Defendant's juvenile criminal history, and arrests that did not lead to convictions. (Id. at 3.)

Despite the unproven nature of charged conduct, "[w]hat crimes a defendant has been charged with in an indictment . . . are [a] relevant and appropriate consideration[] in determining

8

whether to empanel an anonymous jury." United States v. Prado, No. 10-CR-74 (JFB), 2011 WL 3472509, *7 n.5 (E.D.N.Y. Aug. 5, 2011); see, e.g., Quinones, 511 F.3d at 295 (referring to indictment "charg[ing] defendants with murdering a confidential informant in retaliation for his cooperation with law enforcement authorities"); Gotti, 459 F.3d at 346 (District court considered that "defendants were charged with membership in a powerful crime organization."); cf. 18 U.S.C. 3142(g) (in making a determination on bail, courts may consider "the nature and circumstances of the offense charged"). However, the court recognizes that the Government's allegation of current witness tampering based on unidentified "credible information" is not charged in the indictment (and therefore is untested by a grand jury) and is unsupported by other evidence or indicia of reliability. Therefore the court declines to rely on this reason. See Prado, 2011 WL 3472509, at *7 n.5 (declining to rely on anticipated testimony of unidentified witnesses); United States v. Locasio, 357 F. Supp. 2d 558, 562 (E.D.N.Y. 2005) (declining to rely on "confidential source information where there is no indication of the reliability of such information.").

Defendant's remaining arguments amount to questioning the significance or relevance of various Government allegations, which does not create factual issues that necessitate a hearing. Even if the court declines to rely on allegations to which Defendant objects—Defendant's juvenile convictions, Defendant's prior arrests that did not lead to convictions, and information based on a confidential source—there remains ample support for an anonymous jury. Specifically, the court finds that the serious charges against Defendant, which nearly all allegedly relate to a violent criminal enterprise; the Defendant's prior witness tampering in his

state trial[1]; Defendant's adult convictions for narcotics and weapons possession; and the existence of pretrial publicity provide strong reasons for protection of the jury. See Pica, 692 F.3d at 85, 88 (affirming the district court's decision to empanel an anonymous jury based on "the seriousness of the charges, the lengthy prison sentences that convictions would entail, the evidence of [the defendant's] efforts to interfere with the judicial process, and the ability of the defendant to enlist the resources of the Genovese crime family"). Accordingly, the court finds that an anonymous and semi-sequestered jury is warranted in this case.

3.    Constitutional Safeguards

The court, however, takes seriously Defendant's concerns about his fundamental right to an unbiased jury, and establishes the following procedures in this case in order to safeguard those rights: The court will call 500 prospective jurors and administer a detailed questionnaire drafted with input from both parties to screen for juror bias. The court will conduct a careful voir dire of the remaining jurors using questions submitted by the parties to further reveal any prejudices. As stated during oral argument, either side may also apply for extra peremptory strikes. Finally, the court will explain to jurors that they are remaining anonymous and partially sequestered to protect them from intrusion by the media and the public. The court believes that these procedures will secure Defendant's constitutional rights, but should Defendant believe these precautions are insufficient, he may raise his concerns by letter with the court in advance of jury selection.

## III.    HISTORICAL CELL-SITE INFORMATION

### A.    Relevant Facts

On October 9, 2009, the Government submitted a sealed application pursuant to 18

---

[1]    The court makes no independent determination of whether witness tampering occurred in Defendant's state trial, but relies on the state court finding that Defendant and his associates had procured the unavailability of the two eyewitnesses in that case. (See Gov't Jury Mot. at 7-8.)

U.S.C. § 2703(c)(1) and (d), directing Sprint to disclose "historical cell-site information" pertaining to a cell phone number reportedly used by Defendant, for the period from September 1, 2009, until the date the court issued the proposed Order. (Sealed Application (Dkt. 366-1).) According to the application, the target cell phone was issued by the provider to "James Benbow" but used by Defendant. (Id. at 1-2.) Defendant had been arrested with the phone in his possession a few days prior, on October 1, 2009, at which time he had acknowledged that it was his. (Id. at 3.) The Government sought information "identifying the base towers and sectors that received transmissions" from the subject telephone, which would indicate the location of the person using the cell phone. (Id. at 1.) The application was supported by sworn allegations by Assistant U.S. Attorney Carter Burwell ("AUSA Burwell") about how the sought cell-site information was expected to provide evidence that Defendant was engaged in drug trafficking. (Id.)

Magistrate Judge Marilyn Go granted the application on October 13, 2009, finding that pursuant to 18 U.S.C. §§ 2703(c)(1) and (d) the Government had "offered specific and articulable facts showing that there are reasonable grounds to believe that [the cell-site information sought was] relevant to an ongoing criminal investigation into possible violations of federal criminal laws." (Authorization Order (Dkt. 366-1).)

**B.     Defendant's Motion to Suppress**

Defendant argues that the disclosure of the historical cell-site information amounted to a search for the purpose of the Fourth Amendment, requiring a showing of probable cause. (Def. Cell-Site Mot. at 4.) Defendant contends that because the application did not establish or even seek to establish probable cause, suppression of the cell-site information is required. (Id.) At minimum, Defendant requests a Franks hearing to determine if the affidavit used to obtain the

11

Authorization Order was based on false statements. (Id.)

The Government contends that Defendant has no standing to challenge the Authorization Order. It further argues that although this court has previously held in In re U.S. for an Order Authorizing the Release of Historical Cell-Site Info., 809 F. Supp. 2d 113 (E.D.N.Y. 2011) ("In re Historical Cell-Site Info"), that Section 2703 applications for historical cell-site information required a showing of probable cause, suppression is inappropriate under the good faith exception because the Government obtained Defendant's cell-site information in 2009 in good faith reliance on binding precedent. (Gov't Mem. in Opp'n at 17-18.) Finally, the Government argues that the Supreme Court's intervening decision in United States v. Jones, 132 S. Ct. 945 (2012), requires this court to reconsider its prior decision in In re Historical Cell-Site Info. (Id. at 18.)

### C. Discussion

#### 1. Standing

As the proponent of a motion to suppress, a defendant bears the burden of establishing that he has standing to challenge the search or seizure. Rakas v. Illinois, 439 U.S. 128, 130 n.1 (1978). To establish standing, one must demonstrate a subjective expectation of privacy in the invaded area or object that "society is prepared to recognize as reasonable." Rakas at 143 n.12. Moreover, "[l]egitimation of expectations of privacy by law must have a source outside of the Fourth Amendment, either by reference to concepts of real or personal property law or to understandings that are recognized and permitted by society." Id.

The Government argues that Defendant lacks standing to challenge the admission of the historical cell-site data because the phone found in his possession was subscribed to a fictitious person or a proxy—one "James Benbow." (Gov't Mem. in Opp'n at 21.) The Government

posits that Defendant used a phone subscribed by another or under an alias as a means of hiding his illicit activities from law enforcement. (Id.) Citing out-of-circuit case law, the Government argues that such use does not constitute a legitimate privacy interest sufficient to establish Fourth Amendment standing. (Id.)

In response, Defendant submits an affidavit that seeks to establish his grounds for standing. (Def. Aff. (Dkt. 397-1).) In the affidavit, Defendant states that "Mr. Benbow . . . is a real person who used his real name" to register the phone. (Id. at 1) Defendant cites difficulties with obtaining a SPRINT account in his own name as the reason for asking Mr. Benbow to register the cell phone in his name. (Id.) Defendant avers that "the cellphone actually was mine exclusively" and that he was "the sole user of the cellphone" from the time he received it from Mr. Benbow until the date of his arrest. Defendant adds that he paid Mr. Benbow for his part of the Sprint charges for that phone number. (Id. at 2)

Case law is sparse on the question of whether a defendant who used a phone subscribed to another has standing to move to suppress information gathered from that phone. However, the case may be analogized to situations involving storage lockers, hotel rooms, and mail packages. Such cases clearly establish that "[o]ne need not be the owner of the property for his privacy interest to be one that the Fourth Amendment protects, so long as he has the right to exclude others from dealing with the property." United States v. Perea, 986 F.2d 633, 639-40 (2d Cir. 1993) (citing Rakas v. Illinois, 439 U.S. 128 (1978)). For example, one who, with permission of the owner, is in possession of and control over a residence that is not his own home, and can exclude others from it, can have a legally sufficient interest to establish Fourth Amendment standing to challenge a search of such premises. Id. Similarly, a person who possesses personal property belonging to another and who has the right to exclude third persons from possession of

that property has an interest that is similarly protected. United States v. Ochs, 595 F.2d 1247, 1253 (2d Cir. 1979).

Here, there is no dispute that the cell phone at issue was used by Defendant. In his affidavit supporting the October 9, 2009, sealed application AUSA Burwell stated that the phone was issued by the provider to "James Benbow" but used by Defendant. (Sealed Application at 1-2.) AUSA Burwell further averred that Defendant had been arrested with the phone in his possession, at which time he had acknowledged that it was his. (Id. at 3.) It would be improper to allow the Government to gain access to historical cell-site data on sworn affirmation that Defendant *possessed*, *used*, and *acknowledged ownership* of the phone, and yet maintain that Defendant does not have standing to attempt to suppress it. Further, AUSA Burwell's sworn statements are consistent with Defendant's own affidavit, in which he states that although the phone was registered to Mr. Benbow, Defendant "was the sole user of the cellphone," used it "exclusively," and paid Mr. Benbow for the charges for that phone number. (Def. Aff. at 1-2.) The court finds that there is sufficient factual basis to support a finding that Defendant had a legitimate expectation of privacy in the targeted cell phone and therefore Fourth Amendment standing to bring his motion.

2.    Fourth Amendment

The Stored Communications Act ("SCA") permits the Government to obtain an order seeking the historical cell-site location records requested here. 18 U.S.C. §§ 2703(c)(1), (d). The relevant statutory provision states, "[a] governmental entity may require a provider of electronic communication service or remote computing service to disclose a record or other information pertaining to a subscriber to or customer of such service . . . only when the governmental entity . . . obtains a court order for such disclosure under subsection (d) of this

14

section." 18 U.S.C. § 2703(c)(1)(B). Such an order "shall issue only if the governmental entity offers specific and articulable facts showing that there are reasonable grounds to believe that the contents of a wire or electronic communication, or the records or other information sought, are relevant and material to an ongoing criminal investigation." 18 U.S.C. § 2703(d). This showing is lower than the probable cause standard required for a search warrant.[2]

As Defendant points out, this court has previously found that a request for prolonged historical cell-site records pursuant to § 2703 constitutes a "search" for the purpose of the Fourth Amendment, requiring a warrant issued upon a showing of probable cause. See In re Historical Cell-Site Info, 809 F. Supp. 2d at 116. In In re Historical Cell-Site Info, this court explained that, in determining whether governmental action constituted a "search" for the purpose of the Fourth Amendment, two factors control: "(1) the individual has "manifested a subjective expectation of privacy" in the thing searched; and (2) "society is willing to recognize that expectation as reasonable." Id. (quoting Kyllo v. United States, 533 U.S. 27, 33 (1979)). Recounting the then-existing Supreme Court precedent in United States v. Knotts, 460 U.S. 276 (1983) and United States v. Karo, 468 U.S. 705 (1984), this court explained that the two cases stand for the proposition that "the Government's obtaining of some electronically collected location information constitutes a search under the Fourth Amendment depending on the location (Karo) and, potentially, quantity (Knotts) of that information." In re Historical Cell-Site Info, 809 F. Supp. 2d at 117.

Central to that conclusion was United States v. Maynard, 615 F.3d 544, 555 (D.C. Cir. 2010), aff'd in part sub nom. United States v. Jones, 132 S. Ct. 945 (2012). In Maynard, the Court of Appeals for the District of Columbia Circuit held that prolonged electronic surveillance

---

[2]      Defendant does not allege a statutory violation in the issuance of the Authorization Order.

of an individual's location—via the attachment of a GPS tracking device to a vehicle without a warrant—constituted a Fourth Amendment search.

Turning to the facts of that case, the court noted that the Government had effectively requested at least 113 days of constant surveillance. In re Historical Cell-Site Info, 809 F. Supp. 2d at 118. Based on "Maynard's persuasive reasoning," the court found that the cell-site location records sought captured "enough of the user's location information for a long enough time period . . . to depict a sufficiently detailed and intimate picture of his movements to trigger the same constitutional concerns as the GPS data in Maynard." Id. at 119.

Following the court's decision, the Supreme Court affirmed Maynard (under the name United States v. Jones), albeit on different grounds. Justice Scalia, writing for the majority, affirmed on the grounds that the attachment of a GPS device to a vehicle amounted to a search by virtue of physical trespass of private property. United States v. Jones, 132 S. Ct. at 949. In a concurring opinion, Justice Sotomayor emphasized that the Fourth Amendment may be violated even in the absence of a physical trespass, "when the government violates a subjective expectation of privacy that society recognizes as reasonable." Id. at 954. In a separate concurrence joined by Justices Ginsberg, Breyer, and Kagan, Justice Alito stated that the proper analytic lens is existing Fourth Amendment inquiry as to "whether respondent's reasonable expectations of privacy were violated by the long-term monitoring of the movements of the vehicle he drove." Id. at 960. Applying this framework, he found that while short-term monitoring of a person's movements is not a search, extended surveillance surely became a search by the time it crosses the 4-week mark. Id. at 963. In dicta, the majority rejected this sliding-scale approach to what constitutes a search. Id. at 954.

Defendant argues that "at least five of the current Supreme Court justices appear poised to conclude . . . that long-term monitoring via a digital device must be supported by probable cause." (Def. Cell-Site Mot. at 12.) For its part, the Government cautions the court against deciding motion based on *anticipated* evolution of Supreme Court opinions (Gov't Mem. in Opp'n at 30) and argues that the Jones majority opinion requires this court to reconsider its prior decision in In re Historical Cell-Site Info. (Id. at 18.) Even if the court does not reevaluate its prior decision, the Government argues that the good faith exception to the Exclusionary Rule precludes suppression.

Jones does not appear to have substantially altered the state of the law as to historical cell-site records. After Jones, as before, most counts continue to find that a § 2703 order is sufficient without a warrant. See In re Application, 724 F.3d 600, 615 (5th Cir. 2013); United States v. Moreno-Nevarez, No. 13-CR-0841 (BEN), 2013 WL 5631017 (S.D. Cal. Oct. 2, 2013); United States v. Wilson, No. 11-CR-53, 2013 WL 1129199 (N.D. Ga. Feb. 20, 2013) (same); United States v. Graham, 846 F. Supp. 2d 384, 387 (D. Md. 2012) (same); In re Application of U.S., 849 F. Supp. 2d 177 (D. Mass. 2012) (same). At this time, the court declines to reevaluate its previous decision in In re Historical Cell-Site Info because the admissibility of historical cell-site records in this case can be decided based on the basis of the good faith exception.

3.    Good Faith Exception

Under the good faith exception, evidence seized pursuant to a warrant for which actual probable cause does not exist or which is technically deficient is nevertheless admissible if the executing officers relied on the warrant in "objective good faith." United States v. Leon, 468 U.S. 897, 923 (1984). The Supreme Court also held in Illinois v. Krull, 480 U.S. 340 (1987), that the good faith exception applies to evidence obtained by police who acted in objectively

reasonable reliance upon a statute that is subsequently found to violate the Fourth Amendment. Evidence should only be suppressed "if it can be said that the law enforcement officer had knowledge, or may properly be charged with knowledge, that the search was unconstitutional under the Fourth Amendment." Leon, 468 U.S. at 919 (citation omitted).

The Government argues that the cell-site records should not be suppressed because it was obtained in objectively reasonable reliance on the SCA, governing precedent at the time, and the Magistrate Judge's independent review. (Gov't Mem. in Opp'n at 22.) The Government emphasizes that the District Court for the District of Columbia reached a similar conclusion on remand from the Supreme Court in United States v. Jones, 908 F. Supp. 2d 203, 214-16 (D.D.C. 2012) (rejecting motion to suppress cell-site records based on good faith reliance on § 2703). (Gov't Mem. in Opp'n at 23-24.) See also Wilson, 2013 WL 1129199, at *8 (same); Graham, 846 F. Supp. 2d at 387 (same).

The Government's arguments are persuasive. At the time of AUSA Burwell's application in 2009, courts nearly uniformly held that § 2703(c) permits the Government to obtain historical cell-site data based on applications submitted by the United States Attorney's Office articulating "specific and articulable facts." As Magistrate Judge James Orenstein said in 2010, "I have not previously balked at issuing orders to disclose historical [cell-site information] on a showing of 'specific and articulable facts' pursuant to the SCA in large part because, until now, the federal appellate courts to have addressed the issue have uniformly interpreted United States v. Knotts, . . . to hold that location tracking outside the home . . . does not require a warrant." In re Application of U.S. for an Order Authorizing Release of Historical Cell-Site Information, 736 F. Supp. 2d 578, 581 (E.D.N.Y. 2010). The undersigned also stated in 2011 that "the court has previously approved" applications pursuant to the SCA. In re Historical Cell-

18

Site Info, 809 F. Supp. 2d at 114. Similarly, the Second Circuit recently held that a defendant could not show that § 2703 was "clearly unconstitutional" at the time the Government acquired his historical cell-site records pursuant to an order issued by Magistrate Judge Steven Gold in June 2008. United States v. McCullough, No. 12-CR-539, 2013 WL 1729712, at *1 (2d Cir. Apr. 23, 2013) (summary order); see also United States v. Suarez-Blanca, No. 07-CR-0023, 2008 WL 4200156, at *8-9 (N.D. Ga. Apr. 21, 2008) (collecting cases as of 2008).

In this case, the authorization for Defendant's cell-site data in October 2009 preceded Maynard (2010), In re Application of U.S. for an Order Authorizing Release of Historical Cell-Site Information (2010), and In re Historical Cell-Site Info (2011). At the time, therefore, it would have been objectively reasonable for prosecutors to have relied upon § 2703 to obtain historical cell-site data based on an application alleging only "specific and articulable facts."

Defendant does not contest the argument that the Government reasonably relied on § 2703. Rather, Defendant argues that this is a case in which the good faith exception is inapplicable because the executing officer's actions could not have been taken in good faith. At minimum, Defendant requests a Franks hearing to determine if the affidavit used to obtain the Authorization Order was based on false statements. (Def. Cell-Site Mot. at 17.)

Under Leon, the good faith exception is inapplicable and "[s]uppression . . . remains an appropriate remedy if the magistrate or judge in issuing a warrant was misled by information in an affidavit that the affiant knew was false or would have known was false except for his reckless disregard of the truth." Leon, 468 U.S. at 923 (citing Franks v. Delaware, 438 U.S. 154, 155-56 (1978)); see also United States v. Cancelmo, 64 F.3d 804, 807 (2d Cir. 1995).

Under Franks v. Delaware, when "a defendant makes a substantial preliminary showing that a false statement knowingly and intentionally, or with reckless disregard for the truth, was

19

included by the affiant in the warrant affidavit, and if the allegedly false statement is necessary to the finding of probable cause, the Fourth Amendment requires that a hearing be held at the defendant's request." Franks, 438 U.S. at 155-56. "Recklessness may be inferred when omitted information was 'clearly critical' to assessing the legality of a search." Rivera v. United States, 928 F.2d 592, 604 (2d Cir. 1991). But "[a]llegations of negligence or innocent mistake are insufficient" to warrant a hearing. Franks, 438 U.S. at 171.

Defendant argues that AUSA Burwell's application was so incomplete and misleading as to render Magistrate Judge Go's reliance upon it unreasonable. (Def. Cell-Site Mot. at 16.) According to Defendant, omitted from the application was the fact that the Government was then in the midst of investigating the murder of Victor Zapata which occurred approximately two weeks prior, on September 27, 2009. (See Superseding Indictment (Counts 17-21).) Defendant argues that the primary purpose of the cell-site application was to obtain evidence of the *murder*, while the application only referenced potential violations of federal *narcotics* laws. (Def. Cell-Site Mot. at 17.) According to Defendant, this constitutes intentional withholding of information from the court, such that entitles him to a Franks hearing and precludes the application of the good faith exception.

The Government concedes that the cell-site data will be used to establish that Defendant was present in the vicinity of the Wyckoff Houses at the time of the murder of Victor Zapata. (Gov't Mem. in Opp'n at 20.) Yet, it disputes that there was misrepresentation to the court. The Government argues that evidence at trial will show that Zapata's murder was a direct result of a dispute over control of the *drug* trade in the Wyckoff Houses. (Id. at 27.) The Government adds that the subjective intent of law enforcement is of no relevance to the analysis. (Id.) According

to the Government, the SCA does not require prosecutors to set forth an exhaustive list of the potential theories under which the evidence sought may be offered as proof at trial.  (Id.)

The SCA requires that the governmental entity offer "specific and articulable facts" showing that there are "reasonable grounds to believe" that the information sought is "relevant and material to an ongoing criminal investigation." 18 U.S.C. § 2703(d).  In his application pursuant to the SCA, AUSA Burwell asserted that cell-site data are relevant to a DEA investigation into "possible violations of federal criminal laws, including narcotics offenses in violation of 21 U.S.C. §§ 841, 843, and 846"; that Defendant was believed to have used the targeted cell phone, and that historical cell-site data will corroborate eyewitness observations and camera footage. (Sealed Application at 2-2.)  Judge Go granted the application, finding that the Government satisfied its burden under the SCA.  (Authorization Order (Dkt. 366-1).)

While arguably AUSA Burwell should have included in his affidavit a reference to investigation of Zapata's murder, the Government has the better argument here.  It cannot be said that the failure to mention the Zapata murder on the application is the sort of "critical omission," within the meaning of Franks and Rivera, which would have affected the outcome of the application.  The SCA's language is broad and does not premise authorization to access cell-site data upon an investigation of only one category of violations, such as narcotics.  Instead, the statute speaks broadly about information "relevant and material to an ongoing criminal investigation." 18 U.S.C. § 2703(d).  Judge Go found that the Government satisfied that standard based upon AUSA Burwell's allegation regarding "possible violations of federal criminal laws, including narcotics offenses in violation of 21 U.S.C. §§ 841, 843, and 846." There is little doubt that Judge Go would have granted the AUSA Burwell's application even if it had also included the fact that the Government was investigating the murder of Victor Zapata.

21

The court finds that Defendant has failed to sustain his substantial burden under <u>Franks</u> and, thus, his request for a <u>Franks</u> hearing is denied. For the same reason, Defendant has failed to establish that this is a scenario where the good faith exception would not apply under the rule in <u>Leon</u>. As a result, Defendant's Motion to Suppress Historical Cell-Site Information is denied.

## IV. CONCLUSION

For the foregoing reasons, the court GRANTS the Government's Motion for an Anonymous and Partially Sequestered Jury and DENIES Defendant's Motion to Suppress Historical Cell-Site Information.

Jury selection shall proceed as outlined above. Venire and petit jurors shall be identified by number only; their names, addresses, and workplaces shall not be revealed. Jurors shall be kept together during recesses and taken to or provided lunch as a group each day during trial. Jurors shall be escorted to and from the courthouse each day during trial in a manner to be determined by the United States Marshals Service.

SO ORDERED.

s/Nicholas G. Garaufis

Dated: Brooklyn, New York
      March 3 , 2014

NICHOLAS G. GARAUFIS
United States District Judge