SA:RTP/SN
F.# 2010R01491

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
- - - - - - - - - - - - - - - - - - - - - - - - - - - -X

UNITED STATES OF AMERICA

    - against -                    10 CR 615 (NGG)

RONALD HERRON,

          Defendant.

- - - - - - - - - - - - - - - - - - - - - - - - - - - -X


MEMORANDUM OF LAW IN SUPPORT OF THE GOVERNMENT'S
MOTIONS IN LIMINE TO ADMIT EVIDENCE OF
<u>OBSTRUCTION AGAINST DEFENDANT AT TRIAL</u>


LORETTA E. LYNCH
United States Attorney
Eastern District of New York


Shreve Ariail
Rena Paul
Samuel Nitze
Assistant U.S. Attorneys
    (Of Counsel)

<u>PRELIMINARY STATEMENT</u>

The government respectfully submits this memorandum of law in support of its motions <u>in limine</u> in advance of trial in this matter, currently scheduled to begin on May 12, 2014.  Specifically, the government seeks to admit evidence of Ronald Herron's repeated efforts to tamper with witnesses, destroy evidence and otherwise obstruct justice, as direct evidence of (1) the charged racketeering enterprise, of which Ronald Herron was a leader, (2) certain charged racketeering acts, and (3) other offenses charged in the Superseding Indictment.  The evidence is admissible pursuant to Rule 404(b) of the Federal Rules of Evidence.[1]

For the reasons set forth below, the Court should grant the government's motions <u>in limine</u>.

---

[1]     Additionally, by way of this motion, the government provides the defendant and the Court with additional particulars regarding the charged conduct of the defendant, including with respect to various racketeering acts and Counts Nine, Ten and Eleven of the Superseding Indictment.

<u>FACTS</u>

I.    <u>The Superseding Indictment</u>

On February 13, 2012, a grand jury returned a 23-countsuperseding indictment charging the defendant with various offenses, including racketeering, in violation of Title 18, United States Code, Sections 1961(1) and 1961(5), nine racketeering acts and three racketeering-related homicides; racketeering conspiracy, in violation of Title 18, United States Code, Sections 1962(d), 1963(a); three counts of murder in-aid-of racketeering, in violation of Title 18, United States Code, Sections 1959(a)(1); three counts of drug-related murder, in violation of Title 21, United States Code, Section 848(e)(1)(A); three counts of causing death through the use of a firearm, in violation of Title 18, United States Code, Section 924(j); five counts of illegal use of firearms, in violation of Title 18, United States Code, Sections 924(c)(1)(A)(i), 924(c)(1)(A)(ii), 924(c)(1)(A)(iii); conspiracy to distribute cocaine, in violation of Title 21, United States Code, Sections 846 and 841(b)(1)(A)(iii); conspiracy to distribute heroin, in violation of Title 21, United States Code, Sections 846 and 841(b)(1)(C); and multiple counts of illegal firearms possession, in violation of Title 18, United States Code, Section 922(g).

As alleged in the superseding indictment, the Ronald Herron Enterprise "was a gang comprised primarily of individuals residing in and around the Gowanus Houses in the Boerum Hill section of Brooklyn [that] included members of the Bloods street gang. Members and associates of the enterprise have engaged in drug trafficking and acts of violence, including murder attempted murder, robbery extortion and assault."  Superseding Indictment ¶ 1.  "The defendant Ronald Herron, also known as "Ra," "Ra Diggs," and

2

"Raheem" was the leader and a member of the enterprise." Id. ¶ 2.  The purposes of the enterprise included the following: a. [e]nriching the members and associates of the enterprise through criminal activity, including robbery, extortion and drug trafficking; b. [p]romoting and enhancing the prestige, reputation and position of the enterprise with respect to rival criminal organizations; c. [p]reserving and protecting the power, territory and criminal ventures of the enterprise through the use of intimidation, threats of violence and acts of violence, including murder, attempted murder, robbery, extortion and assault; and d.

[k]eeping victims and rivals in fear of the enterprise and its members and associates." Id. ¶ 4.

"Among the means and methods by which the defendant and his associates conducted and participated in the conduct of the affairs of the enterprise were the following: a. [m]embers of the enterprise and their associates used, attempted to use and conspired to use robbery, extortion and drug trafficking as means of obtaining money; b. [m]embers of the enterprise and their associates committed, attempted to commit and threatened to commit acts of violence, including murder, attempted murder, robbery, extortion and assault, to enhance the enterprise's prestige and protect and expand the enterprise's criminal operations; and c. [m]embers of the enterprise and their associates used and threatened to use physical violence against various individuals, including members of rival criminal organizations." Id. ¶ 5.

II.     The Racketeering Enterprise

As previously set forth in briefs filed with the Court, the United States Attorney's Office for the Eastern District of New York ("EDNY") has been involved in a

3

series of multi-agency investigations, involving the Federal Bureau of Investigation ("FBI"), the New York City Police Department ("NYPD") and the Drug Enforcement Administration ("DEA"), into narcotics trafficking, gang and drug-related violence in the Gowanus ("Gowanus") and Wyckoff ("Wyckoff") public housing developments located in Brooklyn, New York. These two neighborhoods, which are separated by only one city block, have suffered tremendously over the past twenty years as a result of violent criminal activity carried out by several notorious criminal organizations.

A. *Origins of the Enterprise*

As early as 2000, while investigating criminal activity carried out in the Gowanus and Wyckoff neighborhoods, the federal government became aware of the development of the Ronald Herron Enterprise, then still in the early stages of development. The Enterprise and its reputation grew stronger over time as Herron's status in the Bloods increased and Herron's reputation for violence became widespread in the community. Herron ultimately rose to become one of the highest ranking Bloods in New York, and his violent criminal enterprise was feared throughout Gowanus and Wyckoff.

Herron's criminal activity began in the 1990s. Herron was convicted as a juvenile delinquent related to an August 9, 1995 arrest for Robbery in the First Degree, when, on June 19, 1998, he was observed disposing of a .38 caliber revolver behind an apartment building located in the Gowanus neighborhood. Herron was arrested on July 23, 1998 inside 423 Baltic Street, Apartment 4E, along with at least one other member of his organization, and was convicted for his possession of a .38 caliber Smith and Wesson revolver. During a search of the apartment, law enforcement recovered a Mac II machine

4

pistol, a .38 caliber revolver and ammunition and numerous empty ziplock bags typically used for the distribution of narcotics.  Herron's status continued to rise thereafter, as he developed a large-scale drug trafficking organization, extorting, robbing, assaulting, and killing to enhance his prestige and power.  Herron promoted his and the organization's reputation for violence through his actions on the streets of the Gowanus and Wyckoff neighborhoods and, by the late 1990s, Herron had consolidated his control over the sale of narcotics from several buildings in the Gowanus neighborhood, including the New York City Housing Authority Buildings in the Gowanus located at 423 Baltic and 198 Bond Streets.

### B. Racketeering Act One: January 1998 – October 2010 - Cocaine Base Distribution Conspiracy

Numerous cooperating witnesses will testify about the nature and extent of the narcotics trafficking operations begun in 1998 and carried out by the Enterprise until October 2010.  In addition, for more than a year before Herron's arrest, law enforcement conducted an undercover buy operation in the Gowanus neighborhood, purchasing crack cocaine from a number of individuals who regularly sold crack for Ronald Herron and his organization. During that time period, law enforcement video and audio-recorded more than one hundred under-cover drug buys involving members of Herron's enterprise.

### C. Racketeering Act Two: September 7, 1998 – Attempted Murder of Kill

The evidence at trial will establish that on September 7, 1998, Herron carried out a shooting with other members of his organization in Wyckoff, where an innocent bystander was shot in the head.  Herron later apologized for the shooting and admitted that he had intended to shoot someone else.

D.   *Racketeering Act Three: June 16, 2001 Murder of Frederick Brooks and the*
     *Related Obstruction of Justice*

The evidence at trial will also establish that, on June 16, 2001, Herron shot and

killed Frederick Brooks in the lobby of 198 Bond Street.[2]   Thereafter, in July of 2001, the

defendant was arrested after the NYPD found him hiding out in 130 Third Avenue,

Apartment 7C, a stash house (the "130 Third Avenue Stash House") run by an individual

who ran a significant narcotics distribution operation in Wyckoff.  Herron was charged by

the King's County District Attorney's Office with the murder of Frederick Brooks.

After he committed the murder, Herron began a brazen campaign to obstruct

justice, destroying evidence and threatening potential witnesses.  The campaign continued

after Herron was arrested.  While on the street, Herron worked with members of his criminal

enterprise and others in Gowanus and Wyckoff to dispose of the firearm he used to kill

Frederick Brooks.  While in jail awaiting trial, Herron sent members of his crew and others

to threaten witnesses who were to testify against him.  Herron personally threatened at least

two witnesses, referred to below as Witness A and Witness B.  And Herron instructed at least

one other potential witness, Witness C - who understood that Herron would have sought to

kill him had he agreed to testify against him - to lie about Herron's involvement in the

murder.

On the day of the Brooks murder, both Witness A and Witness B made

recorded statements to the Assistant District Attorney identifying the defendant as the

shooter and generally recounting the following events.  Witness A and Witness B were

sitting inside a truck with a third person outside 198 Bond Street when the defendant and

---

[2]        The murder of Frederick Brooks is also charged in Counts Five, Six and Eight.

6

Brooks walked by, arguing loudly.  Witness A, after attempting to intervene in the argument, followed the defendant and Brooks inside where he saw the defendant push Brooks against the mailboxes in the lobby, pull out a silver gun and shoot Brooks in the head.  While fleeing the scene and returning to his truck, Witness A heard additional gunshots.  Witness B also observed the defendant and Brooks arguing and watched Witness A follow the two inside. From inside the truck, through the window into the lobby, Witness B saw the defendant choke and then shoot Brooks in the head.  Witness B then saw Witness A flee and heard additional gunshots.  In addition to reporting these events in recorded statements to an Assistant District Attorney, both Witness A and Witness B later identified the defendant as the shooter in a police lineup and in testimony before a state grand jury.  Although they were initially cooperative, both Witness A and Witness B refused to testify at the defendant's trial. The record of the trial demonstrates that the defendant and his associates were involved in an organized campaign to intimidate witnesses, including Witness A and Witness B.  In separate "material witness" proceedings before the trial court, both Witness A and Witness B attempted to recant their prior statements and stated that they had been threatened by the defendant and his associates.   The state trial court, after finding that the defendant and his associates had procured the unavailability of Witness A and Witness B, see People v. Geraci, 85 N.Y.2d 359, 365 (1995); United States v. Mastrangelo, 693 F.2d 269, 272-273, cert. denied 467 U.S. 1204 (2d Cir. 1982), permitted the District Attorney's Office to introduce the witnesses' prior grand jury testimony at trial.  Another eye witness, Witness D, also testified at trial that he/she saw Herron kill Brooks, but refused to identify him from the stand for fear of retaliation.  Herron was acquitted of the murder.  Herron was, however, convicted

of Criminal Possession of a Controlled Substance in the Third Degree related to the seizure of a .38 caliber handgun and narcotics in the 130 Third Avenue Stash House.  On December 11, 2002, Herron was sentenced to an indeterminate prison term of two to six years in New York state custody.

Records from the maximum security Southport Correction Facility and other evidence reflect Herron's continued involvement in the Bloods street gang, the ongoing operation of his enterprise, and his preparation for his return to the streets of Brooklyn in July 2007.[3]  After his release from prison, Herron returned to Brooklyn and quickly solidified the operation of his organization, continuing to extort, rob, assault, and kill to enhance his prestige and power.

### E.  Racketeering Act Four: September 2007 Robbery of John Doe #2

The evidence will show that shortly after his release from jail in July 2007, Herron appeared with other members of his crew at 423 Baltic Street and robbed John Doe #2 as he was selling crack cocaine in the building.  After the robbery, Herron made it clear to John Doe #2 and his associates, who had also been selling in and around 423 Baltic Street, that they would not be permitted to distribute crack cocaine in the building unless they distributed crack cocaine for Herron.  Thereafter, John Doe #2 and some of his associates began to work for the Enterprise.[4]

### F.  Racketeering Act Five: January 2008 – December 2008 Heroin Conspiracy

---

[3]     While in custody, Herron was penalized for over thirty disciplinary infractions, including for the possession of a "shank," his assault of other prisoners and his possession of Bloods gang correspondence.

[4]     The robbery of John Doe #2 is also charged in Counts Nine and Ten.

Evidence will also show that while Herron's organization specialized predominantly in the distribution of crack cocaine, at times, Herron made efforts to develop a heroin distribution network. In 2008, at least two workers in Herron's organization were instructed by Herron or another leader of Herron's organization to distribute heroin in Wyckoff or Gowanus. The organization's efforts to establish a lucrative distribution network in the Gowanus and Wyckoff were, ultimately, unsuccessful and heroin sales by these two workers ceased by the end of the year.[5]

### G.  Racketeering Act Six: May 9, 2008 – Murder of Richard Russo

Evidence will also show that, on May 9, 2008, Herron shot and killed Richard Russo in the elevator of the 423 Baltic Street building.[6] In the days before the murder, Richard Russo had been present in the lobby of 423 Baltic Street with other members of Herron's crew that were selling narcotics. Russo was heard making disparaging remarks about Herron, questioning Herron's dominion over the Gowanus, threatening to kill Herron. On the day of the homicide, Russo was present in the lobby again along with other members of Herron's crew, when Herron entered the lobby and confronted Russo. Herron directed Russo to enter the elevator, along with another member of Herron's crew, pulled out a gun and shot Russo in the head. After the murder, Herron provided cash to one of his crew

---

[5]     The heroin conspiracy is also charged in Count Eleven.

[6]     The murder of Richard Russo is also charged in Counts Twelve, Thirteen and Fifteen.

members in an effort to keep him/her from approaching the police.  Herron also made efforts

to eliminate forensic evidence and disposed of the firearm that he had used to kill Russo.[7]

### H. Racketeering Act Seven: September 2008 - Conspiracy to Murder and Attempted Murder of John Doe #3

Evidence will also show that, in September 2008, Herron and other members

of Herron's crew, including Jorge Mejia, also known as "Moose," or "Mussolini," and

Shondell Walker, also known as "M-Dot," repeatedly attempted to locate and kill John Doe

#3, an individual who was affiliated with a rival group of narcotics traffickers from Wyckoff

who had caused problems for Herron's organization.  Herron, Mejia, and another member of

Herron's crew traveled to an apartment in Wyckoff wearing masks looking for John Doe #3.

Shortly thereafter, John Doe #3 was located and shot by a member of Herron's organization.

### I. Racketeering Act Eight: September 5, 2008 - Attempted Murder of John Doe #4

Evidence will show that on September 5, 2008, Herron was present in a

Manhattan nightclub with at least two other associates when he became involved in an

altercation with club security guards.  During the confrontation, Herron made threats and

used hand gestures indicating his affiliation with the Bloods street gang.  Herron produced a

knife and stabbed one of the club's bouncers as a team of them sought to remove him from

the building.  NYPD officers responded to the club and arrested Herron and two others.

---

[7]     Ten days later, Herron was arrested in the vicinity of 413 Baltic Street, in the Gowanus neighborhood.  This time Herron was found in possession of a gravity knife and over $2,000.

### J.  The September 2008 Dispute with Fort Greene

Evidence will also show that in September 2008, one of Herron's crew members shot another individual at Herron's direction.  In an effort to resolve a dispute between Herron's crew and a group of narcotics traffickers from the Brooklyn neighborhood of Fort Greene, Herron directed that this individual be shot and killed.  At Herron's direction, Mejia and two of Herron's crew members set a trap to kidnap, duct tape, and potentially kill the victim.  The victim was alerted during the operation, was shot while running away, and lived.

### K.  Herron's October 7, 2008 Arrest Wearing Body Armor

Evidence will also show that, shortly thereafter, on October 7, 2008, Herron was arrested again, this time in the vicinity of Baltic and Hoyt Streets on walkway in the Gowanus neighborhood, wearing military-grade body armor.

### L.  Racketeering Act Nine: November 2008 – September 27, 2009 - Conspiracy to Murder and Murder of Victor Zapata, also known as "Macho"

Evidence will show that Herron sought to extend his control of the crack cocaine trade from Gowanus to Wyckoff.   In part as a result of those efforts and the shooting of John Doe #3, in November 2008, Herron and his crew became involved in a dispute with individuals who were selling narcotics in Wyckoff.  Thereafter, one of Herron's workers, who had been selling crack cocaine for Herron in Wyckoff, was told by Victor Zapata that he/she could no longer sell in the neighborhood.  This dispute ended with Herron's murder of Victor "Macho" Zapata.[8]

---

[8]     The murder of Victor Zapata is also charged in Counts Seventeen, Eighteen, Nineteen and Twenty-One.

### a. The November 9, 2008 Shooting of Jorge Mejia

After Herron and Mejia learned that Zapata had told the worker he/she could not sell in Wyckoff Gardens, Mejia traveled to Wyckoff to confront Zapata and his associates and, on November 9, 2008, Mejia was shot approximately five times in the vicinity of Wyckoff. Herron and at least two other members of his crew recorded a meeting held in the hospital on the day that Mejia was shot. In the video, Mejia can be observed lying in a hospital bed recovering from his injuries and Herron, Mejia and other members of Herron's crew can be observed pledging murderous retaliation against Zapata and his associates.

### b. The December 23 2008 Arrest of Herron's Crew Member wearing Body Armor and Carrying a Firearm

On December 23, 2008, one of Herron's crew members was arrested by the NYPD as he fled Herron's car in possession of a loaded .22 caliber Lorcin and body armor. Herron fled the scene and evaded arrest.

### c. The February 2009 Arrest of Mejia with a Firearm

On February 26, 2009, Mejia was arrested in his apartment in 426 Baltic Street, in possession of a .45 caliber Smith and Wesson semi-automatic firearm and a large quantity of marijuana.

### d.  The September 27, 2009 Murder of Victor Zapata

And finally, on September 27, 2009, Herron located Zapata, chased him down, and shot him in the Wyckoff courtyard of the Wyckoff.[9]   Zapata fell to the ground and Herron shot him multiple times at close range, killing him.

### M.  Count 22: Felon-in-Possession - The October 1, 2009 Arrest of Herron and Sharif Holmes

Evidence will also show that on October 1, 2009, just four days after Herron killed Zapata, Herron and another member of Herron's organization, Sharif Holmes, also known as "Sha Guns," were arrested in a BMW that Herron had double-parked on Hoyt Street.  Herron was initially stopped because the car was double parked, but when he refused to move the vehicle, officers arrested him.  Holmes was then asked to get of the vehicle and, as he did, officers observed a loaded, 9 mm Kel-Tec semi-automatic handgun in his pocket and arrested him.

### N.  Count 23: October 5, 2010 – Felon-in-Possession – Arrest of Herron, Shondell Walker and Another Member of Herron's Crew in Manhattan

After Herron was indicted in this case, law enforcement located and arrested Herron, along with Shondell Walker, also known as "M-Dot," and another member of Herron's crew outside of a night club in Manhattan.  A nine-millimeter Hi-Point semi-automatic handgun and ammunition were recovered from the glove-box of the vehicle that Herron, Walker and the other crew member were riding in.

### O.  Other Evidence of Obstruction Carried out by Herron and the Enterprise

---

[9]      That murder is charged as Racketeering Act Nine, Count Eighteen and Count Nineteen.

In addition to the above, additional evidence will show that Herron publicly warned members of his organization and the public, through social media and other means, of the consequences of providing information to law enforcement regarding Herron and the Enterprise's involvement in criminal activities; in one instance, Herron even threatened to kill a member of his organization on a mistaken belief that he/she had provided information to law enforcement about Herron.

ARGUMENT

In addition to providing the Court and the defendant additional detail regarding the government's case, the government respectfully submits this memorandum notifying the Court and the defendant of its intention to introduce evidence of Herron's efforts to obstruct justice, through the destruction of evidence and witness tampering, as direct proof of the racketeering enterprise, the charged racketeering acts and other criminal conduct charged in the case. This evidence is direct proof of the charged racketeering enterprise, the charged racketeering acts and other criminal conduct charged in the case and, in the alternative, is admissible pursuant to Rule 404(b) of the Federal Rules of Evidence.

A. Herron's Efforts to Destroy Evidence, Tamper with Witnesses and to Otherwise Obstruct Justice Are Admissible As Direct Proof Of The Racketeering Enterprise, the Charged Racketeering Acts or the Other Charges in the Superseding Indictment

Evidence of the defendant's efforts to obstruct justice through the destruction of evidence and intimidation of witnesses is admissible at trial as direct proof of the racketeering enterprise, the charged racketeering acts and other criminal conduct charged in the case. In the alternative, the evidence is admissible under Rule 404(b) of the Federal Rules of Evidence.

A. Applicable Law

It is well established that where an event arises "out of the same transaction or series of transactions as the charged offense, if it is inextricably intertwined with the evidence regarding the charged offense, or if it is necessary to complete the story of the crime on trial," evidence of that event is admissible and is not considered "other crimes" evidence under Rule 404(b). See United States v. Carboni, 204 F.3d 39, 44 (2d Cir. 2000);

15

see also United States v. Inserra, 34 F.3d 83, 89 (2d Cir. 1994) (noting that evidence of other "bad acts" may be admitted "to provide the jury with the complete story of the crimes charged by demonstrating the context of certain events relevant to the charged offense"); United States v. Coonan, 938 F.2d 1553, 1561 (2d Cir. 1991) ("The trial court may admit evidence that does not directly establish an element of the offense charged, in order to provide background for the events alleged in the indictment.  Background evidence may be admitted to show, for example, the circumstances surrounding the events or to furnish an explanation of the understanding or intent with which certain acts were performed." (quoting United States v. Daly, 842 F.2d 1380, 1388 (2d Cir. 1988)).

It is likewise well established that evidence of "other" or "uncharged" crimes is broadly admissible in racketeering cases without reliance on Rule 404(b), in light of the elements necessary to prove the existence of such an enterprise.  As the Second Circuit has explained, a racketeering enterprise "is neither the enterprise standing alone nor the pattern of racketeering activity by itself which RICO criminalizes, but [r]ather, the combination of these two elements[.]"  United States v. Pizzonia, 577 F.3d 455, 463 (2d Cir. 2009) (citation and quotation marks omitted).  Accordingly, the Second Circuit has repeatedly affirmed district courts that admitted evidence of "other" or "uncharged" crimes in RICO trials where such evidence proved the existence of a racketeering enterprise and/or the means by which the enterprise operated.

In addition, the Second Circuit has repeatedly permitted the admission of evidence of other bad acts to provide background information to inform the jury of the complete story relating to the crime charged.  See United States v. Williams, 205 F.3d 23 (2d

Cir. 2000); United States v. Pipola, 83 F.3d 556, 565-66 (2d Cir. 1996) ("One legitimate

purpose for presenting evidence of extrinsic acts is to explain how a criminal relationship

developed; this sort of proof furnishes admissible background information in a conspiracy

case."); United States v. Langford, 990 F.2d 65, 70 (2d Cir. 1993) ("It is within the court's

discretion to admit evidence of acts committed prior to the time charged in the indictment to

prove the existence of the alleged conspiracy as well as to show its background and

history."); United States v. Rosa, 11 F.3d 315, 333-34 (2d Cir. 1993) (holding that co-

defendants' relationship over a 14-year period, during which stolen property and narcotics

crimes were committed, "was properly admitted to explain how the illegal relationship

between the two [defendants] developed and to explain why [one defendant] . . . appointed

[the other defendant] . . . to a leading position in the Organization"); United States v. Pitre,

960 F.2d 1112, 1119 (2d Cir. 1992) ("Prior act evidence may be admitted to inform the jury

of the background of the conspiracy charged, to complete the story of the crimes charged,

and to help explain to the jury how the illegal relationship between participants in the crime

developed.").

   Finally, it is well established that evidence of acts of violence are admissible

where that violence was employed to preserve a drug organization's reputation or "drug

turf."  See United States v. Estrada, 320 F.3d 173, 183 (2d Cir. 2003) (holding that "the use

of violence to secure the organization's drug turf [and] carrying and using firearms to enforce

its control over the drug market" were overt acts of a narcotics conspiracy).  Proof of violent

actions taken or discussed by co-conspirators in a narcotics operation is, therefore, not proof

of "other acts," but rather direct evidence of the charged conspiracy.  See United States v.

Miller, 116 F.3d 641, 682 (2d Cir. 1997) (evidence of numerous killings admissible as direct evidence of the narcotics conspiracy and enterprise); United States v. Becerra, 97 F.3d 669, 671 (2d Cir. 1996) ("[the Second Circuit has] 'repeatedly approved the admission of firearms as evidence of narcotics conspiracies, because drug dealers commonly keep firearms on their premises as tools of the trade.'") (quoting United States v. Vegas, 27 F.2d 773, 778 (2d Cir. 1994)); see also United States v. Chin, 83 F.3d 83, 87-88 (4th Cir. 1996) (statements about a contract murder made during a drug deal intrinsic to the defendant's drug conspiracy).

B.    Discussion

Evidence of Herron's efforts to destroy evidence, intimidate witnesses and otherwise obstruct justice is powerfully probative of (1) the existence of the enterprise; (2) Herron's role at the top of the enterprise; (3) the enterprise's efforts to "[p]reserve[e] and protect[]the power, territory and criminal ventures of the enterprise through the use of intimidation, threats of violence and acts of violence," Indictment ¶ 4; and (4) the enterprise's ability to [k]eep[]victims and rivals in fear, id. ¶ 5.  Such evidence also is admissible to "complete the story of the charged crime[], demonstrate relationships of trust and corroborate the testimony of cooperating witnesses."   United States v. Basciano, 03 CR 929 (NGG), 2006 WL 385325, at *10 (E.D.N.Y. Feb. 17, 2006).  In particular, the above-described acts of obstruction demonstrate that Herron was able to rely on the members of his organization, and on the hierarchy he implemented, to protect himself from law enforcement and stoke his reputation in the community as a violent, powerful, and untouchable leader. The destruction of evidence and especially the intimidation of witnesses also furthered the goals of the enterprise by protecting Herron's place atop the organization and thereby

permitting the membership to continue to profit from the sale of narcotics.  That members in the enterprise were willing to commit violent acts, at significant risk to themselves, to cover Herron's crimes also demonstrates the relationships of trust he cultivated in the organization. With respect to the particular crimes the investigation and prosecution of which Herron sought to obstruct, his conduct and that of his underlings also reflects consciousness of guilt.

In addition, such conduct also helps to explain how Herron was able to commit so many crimes over such an extended period of time with seeming impunity.  Herron survived because he was willing to threaten witnesses to escape responsibility for his crimes. His reputation for manipulating the criminal justice system served him well, as civilian witnesses proved unwilling to testify in the face of his threats and members of his criminal organization were unwilling to cooperate with law enforcement officials for many years for fear of violent reprisal.

The jury cannot fully understand the nature of the Ronald Herron Enterprise without understanding the lengths Herron and his criminal associates were willing to go to protect the enterprise and its criminal business.  In this respect the above-described obstruction evidence is inextricably intertwined with evidence of the charged offense.  The Second Circuit has explained that "[t]o be relevant, evidence need only tend to prove the government's case, and evidence that adds context and dimension to the government's proof of the charges can have that tendency." United States v. Gonzalez, 110 F.3d 936, 941 (2d Cir. 1997).   Accordingly, "[r]elevant evidence is not confined to that which directly establishes an element of the crime." Id.; see also Fed. R. Evid. 401, 402.  Indeed, as the Supreme Court has recognized, in analyzing the admissibility of evidence, the trial court

19

should make its determinations "with an appreciation of the offering party's need for evidentiary richness and narrative integrity in presenting a case." Old Chief v. United States, 519 U.S. 172, 183 (1997).

    C.    Herron's Efforts to Destroy Evidence, Tamper with Witnesses and to
          Otherwise Obstruct Justice Also Are Admissible Under Rule 404(b)

          A.    Applicable Law

          Evidence of uncharged crimes or "other acts" is admissible pursuant to Rule 404(b) if it is relevant to the issues of motive, opportunity, intent, preparation, plan, knowledge, identity or absence of mistake or accident.  See United States v. Ortiz, 857 F.2d 900, 903 (2d Cir. 1988).   A party must satisfy three requirements in order for evidence of "other crimes, wrongs or acts" to be admitted under the rule.  First, the evidence must be offered for a purpose other than to prove a defendant's bad character or criminal propensity. United States v. Mickens, 926F.2d 1323, 1328 (2d Cir. 1991); United States v. Colon, 880 F.2d 650, 656 (2d Cir. 1989).  Second, the evidence must be relevant under Rules 401 and 402 and not run afoul of Rule 403.  See Mickens, 926 F.2d at 1328; Ortiz, 857 F.2d at 903; United States v. Levy, 731 F.2d 997, 1002 (2d Cir. 1984).  Third, if the defendant requests that the jury be instructed as to the limited purpose for which the government's evidence is being admitted, the court must furnish such an instruction.  See Mickens, 926 F.2d at 1328-29; Levy, 731 F.2d at 1002.  While the government "must explain in detail the purposes for which the evidence is sought to be admitted," id., the Second Circuit has emphasized that Rule 404(b) is a rule of broad reach and liberal application.  See United States v. Garcia, 291 F.3d 127, 136 (2d Cir. 2002) (citing Pitre, 960 F.2d at 1118); see also Levy, 731 F.2d at 1002

("We have adopted the inclusionary or positive approach to [404(b)]; as long as the evidence is not offered to prove propensity, it is admissible.").

 B. Discussion

   Herron's efforts to destroy evidence, tamper with witnesses and to otherwise obstruct justice is also proof of motive, knowledge and absence of mistake, and therefore is admissible under Rule 404(b).  Because the government seeks to introduce evidence of Herron's efforts to tamper with witnesses and obstruction of justice to prove intent, plan and absence of mistake, and not for the improper purpose of establishing general criminal propensity, and because admission of this evidence would not violate Rule 403, given the nature of the additional evidence that will be offered as direct evidence of the charged conduct, the Court should permit its introduction at trial.

CONCLUSION

For the reasons set forth above, the Court should grant the government's

motion in limine.

Dated:  Brooklyn, New York
        April 8, 2013

                                        Respectfully submitted,

                                        LORETTA E. LYNCH,
                                        United States Attorney,
                                        Eastern District of New York


                        By:     /s/
                                Shreve Ariail
                                Rena Paul
                                Samuel Nitze
                                (718) 254-6616/7575/6465