UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

UNITED STATES OF AMERICA

vs.

RONALD HERRON, also known as "Ra,"
    "Ra Diggs," "Ra Digga," and
    "Raheim,",

                    Defendant.

(S-6) 10 Cr 615 (NGG)

MOTION IN LIMINE TO PRECLUDE RAP MUSIC
AND RELATED VIDEO AND AUDIO CONTENT

COMES NOW the defendant, RONALD HERRON, by and through undersigned counsel, and moves this Honorable Court to preclude the government from admitting into evidence, except for the limited purposes set forth herein, the product of the defendant's video and audio work as a gangsta rap artist and performer, and shows and alleges the following:

INTRODUCTION TO THE PROFFERED EVIDENCE

The government has turned over as part of Rule 16 discovery several music videos on which the defendant performs his rap music. The government has also turned over related videos which are not comprised entirely of the defendant performing music. This latter set of videos, labeled "Ra Diggs TV - Project Music", each bears a specific number in the Project Music series.

Specifically, the defense has received thirteen "Ra Diggs TV - Project Music" videos. (The "Ra Diggs TV Series"). They are numbered 1 through 14, but there is no number 6, 8, or 13. Numbers 1 and 3 contain both a Part 1 and Part 2, bringing the total in the

government production to thirteen.  The Ra Diggs TV recordings vary in length from 5:00 to 10:00 minutes.   In the videos, the defendant is captured on camera talking, interacting with people in the community, driving a car, and rapping.  At times, people other than the defendant have significant time on camera talking, rapping, or both.  Most of the time though, it is the defendant who does most of the talking or performs rhyming songs, or performs rhymes or blank verse not set to music in the style of a rap performance.   The videos at times, like much material in the gangsta rap genre, contain highly inflammatory content and generally refer to shootings, gangs, weapons possession, and drug dealing.

The government has not designated which of the videos, or which excerpts, it intends to offer in evidence at trial, nor have any transcripts been provided.  It has stated, however, it reserves the right to use the entirety of the content on its direct case.

Other than acknowledging the proper purpose of establishing a relationship between the defendant and others who are relevant to the government's case, the defense seeks to preclude the content of the videos nearly in its entirety, on both constitutional grounds pursuant to the First Amendment, and based on relevant evidentiary principles, including the hearsay rule as much that is spoken on the videos is not spoken by the defendant.

Further, because of the importance of the issue as to what if

2

any of the defendant's videos will be heard and seen by the jury --
and the potentially unduly prejudicial content of much that they
contain -- the defense seeks and strongly urges a pre-trial hearing
at which the Court would have the opportunity to personally preview
the content offered, and hear argument from both sides at a time
before trial, when the pressure of having a jury empaneled will not
be a factor.  We believe such a hearing is important to an orderly
trial, including in the preparation of opening statements.  We
further believe if should require no more than one day.[1]

BASIC FACTUAL AND LEGAL BACKDROP
<u>OF THE INSTANT MOTION</u>

A large body of scholarly material now supports a cautious
approach to the admission of rap lyrics against a defendant in a

---

[1]   We have furnished as attachments to this motion draft
transcripts of the Ra Diggs TV videos (with the exception of # 11
and 14), which are annexed as Exhibit A.  We are also furnishing
transcripts of videos produced by the government which are not
labeled as part of that series.  These consist of a draft
transcript of a video labeled "Man Down", which is annexed as
Exhibit B, a transcript of a video labeled "Project Music" which
is annexed as Exhibit C; and a transcript of a music video labeled
"Project Music - Director's Cut," which is annexed as Exhibit D.
None of these transcripts are authenticated, final, or
authoritative.  They are offered to give the Court a sense of what
is contained in the videos and to assist the Court in ruling on the
motions interposed, and nothing more.  The defendant reserves the
right to amend, modify, or correct all of the transcripts attached
hereto for purposes of trial.  Finally, we also seek to file the
transcripts under seal because it is not yet clear which of the
videos will be admitted at trial, and which excluded.  As the
motion has the possibility of being widely reported, we seek to
avoid having the potential jury pool exposed to materials which
might not be offered by the government, or which may be excluded by
rulings of the Court.

criminal trial.  Yet undeniably, the list is long of courts which routinely admit such evidence in case after criminal case on many different theories.    In this filing, the defense seeks the exclusion of the vast bulk of the defendant's gangsta rap lyrics and Ra Diggs TV videos.  The Court is asked, against the weight of frequent admission of rap lyrics at criminal trials in both State and federal courts, to visualize and effectuate a trial in which the government will be limited to witness testimony and physical evidence probative of the defendant's guilt, and a trial which, at the same time, will exclude from the jury's consideration the product of Mr. Herron's creative efforts as an aspiring rapper, which efforts were specifically designed by his managers and him to propel him to a successful rap music career as the fictional gangsta rap character, Ra Diggs.[2]

---

[2]

    The authorities in academia which have lined up to oppose the admission of gangsta rap lyrics, or urge extreme caution in admitting them in court, is long and lengthening as quickly as the number of Courts which regularly admit the evidence.  A small sample of the scholarly work urging preclusion or great caution in admitting rap lyrics includes Stuart P. Fischoff's study, *Gangsta Rap and a Murder in Bakersfield*, 294 J. of Applied Soc. Psychology, 795 (1999)(detailing the author's study of the biasing effects on how a murder defendant's personality is viewed when study subjects were exposed to rap lyrics authored by defendant containing violent, misogynist content; Andrea L. Dennis, *Poetic (In)Justice? Rap Music Lyrics as Art, Life, and Criminal Evidence*, 31 Columbia J.L. & Arts 1 (2007) (surveying lengthy record of admissibility at trials of rap lyrics, but noting too, frequent insensitivity by courts to fact that 'defendants authoring rap music lyrics are engaging in an artistic process that challenges everyday expectations regarding language,'[Dennis, at 13-14], and criticizing courts unfair application of a standard which unfairly,

The bases of the defendant's claims are founded both on principles of First Amendment constitutional law, and application of pertinent evidentiary rules that govern all criminal trials.[3]

---

'treat[s] rap music lyrics not as art but as ordinary speech and allow jurors to do the same.' [Dennis, at 4]); and Charles Kubrin and Erik Nielson, *Rap on Trial*, forthcoming, in Race and Justice, the Official Journal of the American Society of Criminology (2014)(Offering examples of recent cases in which rap music was used as evidence in trials against amateur rappers, almost all of whom are young men of color, to illustrate the specific ways prosecutors present music to judges and juries, as well as to highlight the devastating effects it can have on defendants. Also considering the elements of rap music that leave it vulnerable to judicial abuse, as well as the artistic, racial, and legal ramifications of using this particular genre of music to put people in jail.)

[3] We must note our view that, in contrast to the Court's methodology, placing on the prosecution in the first instance the burden of demonstrating prior to trial a substantiated connection between defendant's rap lyrics and statements in the Ra Diggs TV series, and the charged crimes, is consistent with the requirement that the proponent of evidence affirmatively demonstrate its relevance. (See, 22 Charles Alan Wright & Kenney W. Graham, Fed Prac. And Proc. Evid § 5166 [1st ed. 1978]. Over defense objection, however, this Court directed the defense to move in limine with our objections to admission of the defendant's creative work. We continue to object to this procedure as inappropriately "putting the cart before the horse." We do not know which video materials the government intends to offer at trial, and pursuant to what theories or evidentiary principles. Hence, we continue to object, and respectfully seek to reserve our right to interpose further objections to the government's evidence when we finally have the record of the precise content the government will offer, transcripts of the materials, and references, citations, and specific theories of admissibility.

PART I

DEFENDANT'S RAP LYRICS AND RA DIGGS TV CONTENT
IS ENTITLED TO HEIGHTENED PROTECTION UNDER
FEDERAL FREE EXPRESSION CLAUSE AND SHOULD NOT
BE ADMITTED IN EVIDENCE

Use of Mr. Herron's videos will violate Mr. Herron's right of free expression under the federal constitution. His statements, like so much in the realm of gangsta rap lyrics, may be viewed as specific content meant to evoke, through gritty violent imagery, the reality of the streets and communities in which the defendant was raised, and in which many citizens continue to live today in the inner city. That it may or may not be high art, or refined expression, or particularly pleasant to hear, is irrelevant. That, pursuant to the genre's immutable conventions, it is expressed in the first person as if being lived by the defendant -- like the report of Johnny Cash who tells us he "shot a man in Reno just to watch him die," or Bob Marley, who claims he shot the sheriff, but not the deputy -- cannot fairly be construed to mean the words express admissions of personal conduct, acts, or even the author's true beliefs. They are music and promotional materials; often, but not always, containing clear political content. And unlike the rap lyrics admitted in evidence in most other reported court cases -- and distinguishing them materially for purposes of constitutional analysis -- Herron's rap lyrics were created to be and actually became public speech. They were publicly performed; they were created specifically to be aired and heard; they were publicly

6

disseminated and distributed to as wide an audience as possible
through the internet and radio, because the political messages
being conveyed were <u>intended</u> for that purpose by the defendant, and
his managers.   The comments the defendant made and rhymed about
with respect to the inner city community he knew were intended to
be heard.   His words are not crumpled pages stuck away in a drawer
somewhere found by police during the execution of a search warrant
among the defendant's private effects, or found between the seats
rolled up in the back seat of the defendant's car.   His words were
spoken loudly and deliberately to the public with manifest
political and promotional intent, and often can clearly be
construed as criticism of a society which many argue and believe
does too little to address inequality and racism in ghetto
communities.   As such, their use in this trial will violate First
Amendment principles.[4]

---

[4]   A common observation about "keeping it real" among gangsta
rappers is expressed as follows by Kubrin and Neilson, factoring in
the commercial imperatives driving the rap music industry, in *Rap
on Trial*, <u>supra</u>:

> [B]eginning in the early 1990s, record companies
> began moving away from the politically conscious
> music that had once helped to define mainstream rap
> and instead started pressuring new acts to adopt
> gangsta-type rhetoric while at the same time
> marginalizing those who wouldn't — a trend that
> continues today (Hurt, 2006; Kitwana, 1994; Rose,
> 2008).   This meant that a long line of successful
> performers began adopting a "commercial gangsterism"
> (Perry, 2004), essentially a persona manufactured by
> artists who had no meaningful connections to gangs

The promulgation of Mr. Herron's work is significant.   In Snyder v. Phelps, 562 U.S. __, 131 Sct. 1207 (2011), the Supreme Court specifically analyzed in the context of a tort action the differing levels of protection to which speech is entitled pursuant to the First Amendment depending on what is intended to be expressed, and the context in which the speech is uttered or publicized.   In Snyder, the congregants of the Westboro Baptist Church picketed the Maryland funeral of a soldier killed in Iraq because the church believes the United States is overly tolerant of sin, and God kills American soldiers as punishment.   After the service, Albert Snyder, the soldier's father, filed a tort action seeking damages for intentional infliction of emotional distress and other related claims, and won a jury award against the church of several million dollars.

The Supreme Court held that whether the First Amendment prohibits holding Westboro liable for its expressions "turns

_____

or street life but who willingly conformed to gangsta conventions to secure recording deals with major record labels (Price, 2006; see also Krims, 2000, p. 71).   As rapper Andy Cat from Ugly Duckling stated in an interview with Paul Edwards (2009), "A lot of rap is autobiographical —- it's talking about where you're from, and your life, and all that, but I got news for you, [many classic hip-hop artists], they used to make it all up.   They weren't going out killing people every night —- it's called creativity."

Kubrin and Neilson, pp. 23-24.

largely on whether that speech is of public or private concern as determined by all the circumstances of the case." Snyder, 131 S.Ct. at 1215. It held that speech on "public issues" occupies the "highest rung of the hierarchy of First Amendment values, and is entitled to special protection." Id.

Essentially, the Supreme Court gave short shrift to plaintiff's arguments that Westboro's speech was not public because it was directed personally at the specific funeral of his son, and was directed at and occurred at that solemn ceremony. Rather, the Supreme Court's focus was on Westboro's purpose in its expressions, and what the church aimed to convey by its picketing as to an issue of public significance:

> The content of Westboro's signs plainly relates to broad issues of interest to society at large, rather than matters of purely private concern.' [Citation omitted]. The placards read, "God Hates the USA/Thank God for 9/11," "America is Doomed," Don't Pray for the USA," "Thank God for IEDs," "Fag Troops," "Semper Fi Fags," "God Hates Fags," Maryland Taliban,", "Fags Doom Nations," "Not Blessed Just Cursed," "Thank God for Dead Soldiers," "Pope in Hell," "Priests Rape Boys," "You're Going to Hell," and "God Hates You." While these messages may fall short of refined social or political commentary, the issues they highlight -- the political and moral conduct of the United States and its citizens, the fate of our Nation, homosexuality and the military, and scandals in the Catholic clergy -- are matters of public import. The signs certainly convey Westboro's position on these issues, in a manner designed ... to reach as broad an audience as possible.

Id. at 1217.

Many commentators in academia refer to the profound efforts of

gangsta rappers to call attention to the plight of inner city residents and the often bleak prospects of youth from inner city housing projects to escape the cycle of violence and incarceration which plagues their communities. Depictions of "real life" in these communities and the situations residents encounter are not necessarily endorsements of violence nor admissions of acts of personal violence by the author; they may be also viewed as grim commentaries on daily life in a world without opportunity, positive role models, sobriety, resources, or hope. That's what art does.

Much of Ronald Herron's work is a commentary on urban crime and violence, drug wars, and the utter lack of hope in the inner city he knows.

Ra Diggs TV – # 3, Part 2 is an example. It is a scene on the street with the defendant surrounded by young black males at night. They are talking about rap music, and they are contrasting the authenticity of the street lives they lead to that of other "fake" rappers who do not "keep it real." They talk about the niggas "up north" [i.e., in prison] and how they represent them. After others speak into the camera, the defendant says he will now "put things back in proper perspective." An excerpt from his rhyme in the video reads:

> Ears peeled to the ground so I can hear what the
> street say ... Post bail, skip out of state, nigga
> you loco broke nigga. I could hear your stomach
> growl in your vocals. Rent money will provoke you,
> sneaker money will smoke you. Nigga, new case? The
> DA will quote you, nigga. I ain't grinding on the

> trap, but I know I'm going back, knowing whatever I
> face in the can got life on the back.   I ain't
> working no slave at no age, nigga, rather die of
> AIDS before a nigga get paid minimum wage.   And its
> like in this day and age, if I ain't getting paid,
> then the hammer's getting cocked, and something's
> getting sprayed ... Homie this is college.[5]

None of these comments can fairly be interpreted as autobiographical or admissions of personal commission by the defendant of specific crimes, or as expressions of motive or intent to commit specific crimes.   They are efforts at expression of a reality the defendant has observed, felt, heard about, or imagined. The words the defendant utters about "cocking the hammer" if he "ain't getting paid" and "something getting sprayed" -- while sure to offend many on a jury -- are also far more likely to unfairly prejudice the defendant than provide the jury with competent, fair, and reliable evidence of the defendant's actual participation in any of the crimes charged.

In Ra Diggs TV # 2, Part 1, the defendant comments pointedly about the killings of Amadou Diallou and Sean Bell, two unarmed citizens killed by New York City officers in hails of bullets, which provoked widespread public outrage in many quarters.   The video, in which the defendant recommends to his listeners securing a firearm license and firearm, or alternatively, donning a bullet-proof vest for protection against the police, is also annexed as

---

[5]   The excerpt quoted constitutes a draft of part of Ra Diggs TV - # 3, Part 2, which as already noted, is annexed as part of collective Exhibit A.

part of collective Exhibit A.

These statements are clearly "speech on public issues" -- written, spoken, and disseminated publicly by the defendant and his managers to as wide an audience as he could reach.

Many of the videos simply describe in non-specific terms the defendant's life as a violent drug dealer, the same way "Scarface" or "The Godfather" tell the story of outlaws as a combination of social commentary and entertainment, and depict on screen a corner of the world we all inhabit, but most of us have no real exposure to.  See the transcript of "Man Down", one of the videos turned over which contains a combination of the defendant's speech and singing / rhyming.  Annexed as Exhibit B.  It is submitted that there is nothing about this video which contains competent evidentiary material, other than that it shows the defendant has a relationship with the people who appear with him in the video.

Thus, like the Westboro church expressions in Snyder -- although expressed at and referenced specifically to the funeral of a particular Iraqi war victim -- the speech in Herron's work refers and relates to "broader public issues" as its "overall thrust and dominant theme." Id.

Accordingly, Herron's public speech on matters of public import, is entitled to "special protection" under the First

Amendment.  Id. at 1219.[6]

And the way this "special protection" must be realized where there is a danger of suppressing or "chilling" constitutionally protected speech is also set forth in Snyder.  The risk of suppression of speech is "unacceptable" so the speech must be tolerated "in order to provide adequate 'breathing space' to freedoms protected by the First Amendment."  Id.  And because the speech conveys messages of profound public concern, it is entitled to and must receive First Amendment protection.

If this is so, how can such protection be realized in the context of a criminal prosecution?

Dawson v. Delaware, 503 U.S. 159 (1992) offers one model.  In Dawson, the Court ruled that defendant's membership in a racist white supremacist prison gang was not probative of any issue relevant to sentence, and, therefore, violated his First Amendment right to free association.  The Court held the First Amendment prohibited the use of that evidence, which proved nothing more than a defendant's possession of "abstract beliefs."  Dawson, 503 U.S. at 167.

Here, the evidence the government may offer fails to meet

---

[6]   Herron's speech not only relates to matters of "political, social, or other concerns to the community" and therefore qualifies for "special [First Amendment] protection," but it is also the "subject of legitimate news interest; that is a subject of general interest and of value and concern to the public."  On this ground, too, it therefore qualifies for "special protection" under the First Amendment analysis set forth in Snyder.

constitutional standards for many reasons. The lyrics and pronouncements of the defendant do not constitute admissions to any specific crimes. Often they reflect "abstract beliefs" about law enforcement, cooperators, and the unfairness of the criminal justice system. They contain typical gangsta rap braggadocio concerning the defendant's toughness relative to the "competition", but many of such references can fairly be interpreted as referring to the defendant's competition with other rappers, and standard rapper protestations about "keeping it real."

Allowing the jury to hear the defendant's rap lyrics and the Ra Diggs TV speeches undervalues the importance of freedom of speech, and will necessarily have a "chilling effect" on free expression. Moreover, admitting fictional, artistic writings to prove "state of mind" or some other similar evidentiary concepts will fail to provide the "breathing space" which the defendant's work should be afforded.

For these reasons, the defendant's motion to preclude the Ra Diggs music videos and Ra Diggs TV series videos on First Amendment grounds should be granted in its entirety.

PART II

**DEFENDANT'S RAP LYRICS AND RA DIGGS TV CONTENT
IS LARGELY IRRELEVANT, LACED WITH HEARSAY, AND
WHEN PROBATIVE, IS FILLED WITH MATTERS UNDULY
PREJUDICIAL AND IF ALLOWED TO BE PRESENTED TO
<u>THE JURY, WILL DENY THE DEFENDANT A FAIR TRIAL</u>**

A.  <u>The Videos Are Irrelevant, or Otherwise Inadmissible.</u>

As noted, we have annexed in nearly its entirety, draft trans-cripts of the Ra Diggs TV series videos.  Three videos not in the series itself, but which were turned over by the government, titled "Man Down", "Project Music" and "Project Music - Director's Cut," are also annexed as Exhibits B, C, and D respectively.

The vast bulk of the videos produced are irrelevant pursuant to Fed. R. Evid. 401, as they simply do not have a tendency to make the facts the government seeks to prove more or less probable.  As noted, even if the material is relevant, we object to admission of the videos pursuant to the constitution, and note that Fed R. Evid. 402 provides that even relevant evidence is not admissible if there is a valid prohibition pursuant to the United States Constitution.  Finally, Rule 403 is invoked to exclude the videos on the basis that even if they have some probative value, that value will be substantially outweighed by the danger of unfair prejudice, confusing the issues, and misleading the jury.

We refer as an example to the defendant's video entitled Man Down, a draft transcript of which is annexed as Exhibit B.  It is filmed on the rooftop of a project building.  In it, among other

15

things, the defendant describes himself as a descendant of great rappers who came before him, both because he grew up listening to them, and because he was schooled by his brother to be a rapper since he was ten years old.  He states:

> We ascending, we ain't descending, man.  We ain't going backwards, homie.  We ain't doing that, we breaking that cycle, right now.  You know what I mean?  Elevating me and my 'hood.  [UI] I know where I come from so I know where I'm going.  You know what I'm saying?  So I take it back here.  My 'hood.  Put my 'hood on the map.  We gonna take this all the way to the top, man.  We gonna take it to one of them skyscrapers over there, feel me?

> *          *          *

> They think I'm slipping 'cause I'm getting too much money to be gripping now.  But yous' a clown if you think I won't grip that four pound and lay a bitch ass nigga down.  I'm a boss.  Twice I went head to head with Charles Hynes office and never lost.  I'm a boss. Twice I went head to head with Charles Hynes office and never lost. Nigga. Diggs man. Yo man.

Whether the government intends to offer this video, as noted, we do not know.  But these lines are representative of the potentially unduly prejudicial material the defendant often recites, which, it is submitted, is rivaled in this instance only by its irrelevance to the elements of the crimes the government must prove by competent evidence of guilt.

The lines are similar to many other references in which the defendant boasts of "beating case after case," and other similar conceits.

The fact that the defendant sings that he "beat the body, beat

the attempt," (a refrain of his, and part of the lyrics of his song, "Slow Down") and the fact that he phrases his encounters with the Kings County District Attorney's Office in terms of having "gone head to head with Charles Hynes office two times and never lost" is irrelevant to whether he is guilty of the crimes with which he was charged in those cases (and charged again now). Moreover, the fact that he chooses as a recurring theme in his work, to boast of his victories in prior criminal cases brought against him by the Kings County District Attorney's Office reveals nothing about whether he committed the crimes charged, but rather exhibits his intent to publicize and cultivate a "Teflon Don" image, and to consequently, enhance his marketability and prospects of commercial success in the hip-hop world in which he aspired to success.

Indeed, the only certain consequence of admission of such evidence is that it will offend many jurors, rather than properly inform them. And those whose sensibilities may favor somewhat greater humility will be unduly and unfairly prejudiced. But a lack of humility and sensitivity on the defendant's part is no crime. More importantly, for purposes of evidentiary principles, his boastful pronouncements, if subjected to analysis, are most often not probative or even suggestive of guilt, but consistently have a marked tendency to be mis-construed, or to be so offensive as to be unfairly and unduly prejudicial pursuant to Rule 403.

Indeed, most of the statements within the defendant's body of work possess little probative value as to guilt, and should be excluded in their entirety.

Further, a large number of the videos contain rank hearsay. An example is Ra Diggs TV # 3, Part 2, which contains many statements and rap music of other individuals.  Ra Diggs TV # 4 contains a lengthy phone call.  And Ra Diggs TV # 9 and # 10 contain many statements of other individuals which are hearsay. The court is referred to the transcripts which are annexed.

Additionally, much of the content is highly inflammatory without any discernible probative value.  An example is Ra Diggs TV # 12, in which Mr. Herron discusses at length his views about homosexuality, and related matters.  The Court is referred specifically to the transcript, beginning at the bottom of page 1 with the words, "Nah nah nah ...," and continuing throughout the remaining content.

Finally, we reiterate once again that absent affirmative proffers from the government as to which videos will be offered, we object to everything as set forth herein, and will try to be more discerning and specific when we have more information from the government.

B.  The Court Should Hold a Pre-Trial Hearing Before Jury Selection to Decide the Issues Raised by Government's Offer of the Videos.

We request that the Court adopt a pre-trial hearing methodology recommended in the law review article of Andrea L.

18

Dennis, entitled *Poetic (In)Justice? Rap Music Lyrics as Art, Life, and Criminal Evidence*, 31 Columbia J.L. & Arts 1 (2007).

Professor Dennis is a critic of the ubiquitous use of rap lyrics in criminal trials, but her article, supra, does not advocate never admitting them, but changing the analysis of how admissibility is determined. We have made our views clear that we oppose the admission of Mr. Herron's lyrics and the related content on the videos. Whatever decision the Court makes on the evidentiary issues, however, we strongly urge in the interest of an orderly trial, that such decisions be made in advance of trial. Professor Dennis is one proponent of this methodology. She writes:

> Courts should take a balanced approach to the admission and evaluation of defendant-authored rap music lyrics in criminal matters. Such an approach must recognize that defendant-authored rap music lyrics are subject to interpretive ambiguity, be cognizant of the assumptions that defendant-authored rap music lyrics are necessarily autobiographical or inculpatory, and reveal the character-based and unfairly prejudicial nature of rap music lyrical evidence.

31 Columbia J.L. & Arts at 30.

Her analysis asks courts to consider adopting an entirely different analytical framework than is often employed in deciding whether to admit rap lyrics at a criminal trial. It advocates a pre-trial hearing to decide the admissibility issue, and the admission of expert testimony to assist the jury to understand and evaluate the evidence they are being asked by the prosecutor to interpret as confessional on the defendant's part, and an accurate

reflection of his state of mind.   Dr. Dennis writes:

> Optimally, the relevance determination would be made
> either prior to trial or during a hearing outside
> the presence of the jury.   During the hearing, the
> prosecution would be obliged to expressly articulate
> a theory of relevance ... To do so, the prosecutor
> should address and courts should resolve the
> following questions: (1) whether the lyrics were
> written before or after the charged offense or at
> some other point remote in time; (2) whether the
> lyrics provide details or information about the
> charged crime that only the perpetrator of or a
> participant in the crime would know; (3) whether the
> case involves a crime receiving attention in the
> defendant's community such that facts and
> circumstances surrounding the crime would be public
> knowledge; (4) whether the statements of conduct or
> belief are consistent with evidence relating to the
> charged crime: (5) whether the statements of conduct
> or belief in the lyrics are corroborated by other
> evidence such as eyewitness testimony, pictures,
> proof of prior conviction, or forensic evidence; (6)
> whether the language or themes in the lyrics are
> ubiquitous or provide evidence of a unique modus
> operandi or belief; and (7) whether the lyrics are
> internally consistent and coherent such that they
> accurately or reliably describe the alleged crime.

We ask the Court to adopt an approach that considers these recommendations, and which acknowledges scholarly work on the subject of rap music as evidence which shows that authorship of rap lyrics by a defendant -- which by convention are necessarily both written in the first person and replete with violent imagery -- has the power to paint a defendant in a profoundly negative light before even a shred of evidence is heard.

WHEREFORE, for all of the foregoing reasons, it is respectfully requested that this motion be granted in its entirety, and that the rap lyrics and related video materials produced by the

government be excluded in their entirety, or, that an evidentiary
hearing be convened in advance of trial to resolve the evidentiary
issues raised.

_____ (SC)
ROBERT A. SOLOWAY

_____ (SC)
JAMES E. NEUMAN