UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
------------------------------------------------------------------------X

UNITED STATES OF AMERICA

                                                    **MEMORANDUM & ORDER**

          -against-                                 **10-CR-0615 (NGG)**

RONALD HERRON,

                    Defendant.

------------------------------------------------------------------------X
NICHOLAS G. GARAUFIS, United States District Judge.

Pending before the court is Defendant Ronald Herron's pretrial Motion to Suppress the

body armor seized from his person on October 7, 2008. (See Def. Mot. (Dkt. 378).)[1] On March

27, 2014, the court held an evidentiary hearing regarding Defendant's motion. (See Mar. 27,

2014, Hr'g Tr. (Dkt. 410).)[2] At the hearing the court received testimony of New York City

Police Department ("NYPD") Officer Carlos Anchundia and Lieutenant John Fioravante. (Id.)

At the conclusion, the court directed the parties to submit supplemental briefs. The testimony

and documentary evidence admitted at the suppression hearing established the following facts.

I.      **FACTS**

        A.      **Events on the Street**

        On October 7, 2008, Officer Carlos Anchundia and his partner Officer Sambath Ouk,

members of a unit charged with addressing quality of life offenses, were patrolling the 76th

precinct in a marked police van. (Id. at 5-6, 45.) At about 6:00 p.m. the officers received a 911

radio transmission requesting a police response. (Id. at 7-8.)

---

[1] The court refers to its March 3, 2014, Memorandum & Order for a fuller recitation of the charges and background
of this case. (Mem. & Order (Dkt. 399).)
[2] Citations to "Tr." refer to the March 27, 2014, Hr'g Tr. (Dkt. 410).

The radio transmission was a "10-10," meaning a possible crime. (Id. at 6-7, 77.) The call described a "male with a firearm, . . . black, six feet tall, blue jeans, black leather coat, wearing sunglasses" coming from a barbershop near Baltic and Hoyt Streets.[3] (Id. at 7, 25-26, 78.) The officers proceeded to drive to the Gowanus Houses, a high-crime residential area, arriving about five minutes after receiving the radio call. (Id. at 8-9, 27, 42.)

The officers pulled onto a walkway in between two buildings of the Gowanus Houses and saw Defendant, who fit the description provided by the 911 caller, walking alone toward their van. (Id. at 9-10, 42-45, 65.) Officer Anchundia testified that he had never seen the man before, but recalled that he was wearing blue jeans, a black leather coat, sunglasses and was six feet tall. (Id. at 9, 50.) He also noticed that the man's jacket "was a little puffier than a normal fitted leather coat would be." (Id. at 10-11.) This was "significant" to Officer Anchundia because the "bulk" reminded him of the appearance of fellow officers wearing bulletproof vests. (Id. at 11.) Officer Anchundia later learned that the man's name was Ronald Herron. (Id. at 7.)

Officer Anchundia's testimony was contradictory as to the precise order of what happened next. On direct examination he testified that as officers drove toward Defendant, he threw a clear wrapper to the ground before the officers exited the vehicle. (Id. at 11.) On cross-examination, however, Officer Anchundia testified that he saw Defendant discard the wrapper "[o]nce I step[ped] out the van." (Id. at 46.) Asked for more details about the wrapper, Officer Anchundia testified that it "was like a clear wrapper," but he did not "know what name brand it was or anything like that." (Id. at 11.) He did not know if it was a candy wrapper, a piece of foil, Saran Wrap, or the covering of a sandwich. (Id. at 49.) Officer Anchundia could not recall

---

[3] A relevant excerpt of the radio run transcript reads, "10-10 FIREARM/OUT MB W GUN . . . HOYT ST WARRANT ST – BALTIC ST . . . PERP 6 X 2 . . . LIGHT COMP . . . WRNG DK SHADES . . . LEATHER JACKET N BB . . . ALL IN BLACK . . . ACROSS THE STREET FRM BARBER SHOP . . . PERP IS SHOWING THE GUN TO SOMEONE . . . ANON MC." (Gov't Ex. 7.)

anything about the wrapper other than it was clear plastic. (Id. at 11, 50.) In any event, Officer Anchundia believed that Defendant had committed a "qualify of life crime" by littering. (Id. at 12.)

Officer Anchundia left the van running, placed his hand on his firearm, and began approaching Defendant, who was about 15 feet away and walking toward the van. (Id. at 13-16, 25.) Defendant did not run from them, but raised his hands and "smirked" at the officers, which Officer Anchundia interpreted to mean that Defendant was "arrogant." (Id. at 13-14, 50.) Officer Anchundia asked him to place his hands on a nearby gate. (Id. at 14.) Defendant complied and made no effort to hide anything. (Id. at 15, 53.) He was "cooperative" and "very respectful." (Id. at 52.) Officer Anchundia started patting down Defendant. (Id. at 15.) He felt a "hard object" above Defendant's chest and realized "[r]ight away" that it was a bulletproof vest. (Id.) Of the hundreds of people Officer Anchundia had stopped in his career, Defendant was the only one wearing body armor. (Id. at 61-62.) However, Officer Anchundia did not observe the outline of a gun. (Id. at 52.) After frisking Defendant, Officer Anchundia immediately placed Defendant in handcuffs, still concerned that he might possess a firearm. (Id. at 17, 54.)

At that point, Officer Anchundia intended to arrest Defendant for possession of the bulletproof vest and for littering. (Id. at 18.) However, Officer Anchundia did not look around the area for evidence of littering after handcuffing Defendant. (Id. at 19.) Asked why he did not collect the wrapper, Officer Anchundia said, "It was a mistake I made. I was just focused on the individual, that he doesn't escape or anything like that." (Id. at 19, 53.) A crowd began to gather some time after Defendant was handcuffed. (Id. at 53.)

3

Officer Anchundia's supervisor, Lieutenant John Fioravante, and other officers arrived at the scene about two minutes after Officer Anchundia had handcuffed Defendant. (Id. at 19-20, 79.) Officer Anchundia briefly conferred with Lieutenant Fioravante, advising him about the bulletproof vest and the littering. (Id. at 20-21, 82.) Lieutenant Fioravante testified that he knew Defendant because the latter had a "history of being known to be violent." (Id. at 83.) Lieutenant Fioravante explained that in May of 2008, he had observed Defendant in possession of an illegal gravity knife, for which Defendant was arrested. (Id.) Lieutenant Fioravante also testified that in May of 2008, he had spoken to Detective Joseph Fazzingo from the "narcotics major case squad" and heard "of different investigations, ongoing [federal] investigations that were occurring with Ronald Herron and other individuals." (Id. at 84.) Lieutenant Fioravante added that he heard "from other units within the police department" about "other investigations that possibly [Defendant] was involved with," including possibly in October of 2008. (Id. at 94.)

Lieutenant Fioravante testified that while on the scene, he noticed the wrapper that Defendant had thrown on the ground but did not pick it up because his "main concern was there was a crowd gathering" and he thought it best to investigate the incident further at the precinct. (Id. at 83.) Lieutenant Fioravante said that he wasn't sure then if Defendant would be charged with wearing the vest, and he intended to investigate that at the precinct, principally to ascertain whether the vest had been stolen. (Id. at 85.) He also wanted to make sure that there were no outstanding warrants for Defendant's arrest. (Id. at 84-85.) Lieutenant Fioravante instructed Officer Anchundia to place Defendant in the police van and drive him to the precinct. (Id. at 21, 84.)

**B.    Events at the Precinct**

Once at the precinct, Officer Anchundia placed Defendant "in a prison arrester, with his

4

name, all of his pedigree." (Id. at 28.) Defendant had been arrested "for wearing the bulletproof vest and littering." (Id.) Officer Anchundia removed some articles of clothing from Defendant, including the body armor. (Id. at 28-29, 57.) He also removed some paper and money in Defendant's pockets. (Id. at 29.) A firearm was never recovered.

While at the precinct, Officer Anchundia and Lieutenant Fioravante learned that they could not arrest Defendant for wearing the vest because it is not a crime to wear a bulletproof vest, so long as one was not using it in the commission of a crime.[4] (Id. at 28, 89.) The officers conducted an investigation into Defendant and the vest, believing that the body armor might have been stolen. (Id. at 32, 85.) They could not uncover any evidence that the vest had been stolen. (Id. at 32.)

As the detention continued, Lieutenant Fioravante telephoned Detective Fazzingo and informed him that Defendant was in custody, was being issued a summons, and had been wearing a bulletproof vest. (Id. at 86.) Asked on cross-examination why he thought that the bulletproof vest might have significance in connection with the investigation involving Detective Fazzingo, Lieutenant Fioravante said, "I believed if he was someone wearing a bulletproof vest, it could be either for protection from maybe retaliation with regards to homicides, with regards to drug trafficking. I figured it would help the [federal] case." (Id. at 87.) Detective Fazzingo asked Lieutenant Fioravante to voucher the vest because he was going to obtain a federal subpoena. (Id.)[5]

Defendant remained at the precinct between one hour and an hour and a half. (Id. at 29, 32, 34, 88.) Absent any evidence that the vest had been stolen, Officer Anchundia processed

---

[4] Officer Anchundia acknowledged that he had never studied the law about vests. In fact, had he done so, he said "I would have let [Defendant] go in the street with a summons." (Tr. 56.)

[5] Although at the evidentiary hearing Lieutenant Fioravante referred only to a "federal subpoena," the Government represents in its motion papers that this was a federal grand jury subpoena obtained by the U.S. Attorney's Office for the Eastern District of New York. (Gov't Mem. in Opp'n at 8.)

Defendant only for littering and issued a summons. (Id. at 33-34.) Defendant was not fingerprinted or photographed. (Id. at 71-72.) Items of personal property seized from Defendant incident to his arrest were returned to him upon his release, but the officers retained the bulletproof vest. (Id. at 34, 88.) Lieutenant Fioravante testified that he retained the body armor "based on the authority of Detective Fazzingo." (Id. at 90.) He believed it was "the right thing to do, to have the vest vouchered" after Detective Fazzingo signaled his intention to get a "federal subpoena." (Id.) Asked on cross-examination whether he would have seized the vest had he not heard from Detective Fazzingo, Lieutenant Fioravante said "possibly [due to Defendant's] prior background, his prior history." (Id. at 91.)

On cross examination, Officer Anchundia could not explain why the voucher for the vest (Def. Ex. B) originally included the notation "vouchered for investigatory purposes," which was then changed to "vouchered for arrest evidence." (Tr. 59.) Later that night or the next morning—after Defendant was released from the precinct—Detective Fazzingo came to the precinct and retrieved the vest pursuant to the federal subpoena. (Id. at 87, 92.)

As to the littering charge for which Defendant was arrested, Officer Anchundia did not know the ultimate disposition. (Id. at 40.) He did not personally appear in court for that case and did not know whether anyone else did either. (Id. at 41-42.) An exhibit not admitted at the hearing but provided to the court with the Government's supplemental brief (Gov't Ex. 3500-SO-2) demonstrated that Defendant's littering charge was ultimately resolved by Adjournment in Contemplation of Dismissal ("ACD").

## II.    THE PARTIES' CONTENTIONS

In his supplemental brief submitted subsequent to the evidentiary hearing, Defendant has narrowed his argument from the broad challenge made in his opening brief. (See Def. Mot. at 2.)

6

Defendant concedes that police officers had authority to stop and frisk him on the basis of the 911 call about a man matching his description with a gun. (See Def. Supp. Mem. (Dkt. 408) at 7.) But Defendant maintains that the subsequent arrest for littering was unsupported by probable cause. (Id.) He primarily attacks the credibility of Officer Anchundia's testimony that he observed Defendant littering. (Id. at 8.) Defendant argues that he would not have littered in plain view of police, that the officers failed to collect the food wrapper as evidence of littering, and that the littering charge was never seriously pursued. (Id.) Defendant also argues that police did not have probable cause to seize the body armor when he was released from the precinct. (Id. at 10.)

The Government maintains that the officers had probable cause to arrest Defendant for littering. (Gov't Mem. in Opp'n (Dkt. 395) at 9-10; Gov't Supp. Mem. (Dkt. 419) at 6.) According to the Government, Officer Anchundia's testimony regarding Defendant littering was corroborated by the other evidence adduced at the hearing, even in the absence of the wrapper. (Gov't Supp. Mem. at 7.) The body armor was thereafter properly discovered pursuant to a search incident to arrest and seized as evidence of Defendant's criminal conduct. (Gov't Mem. in Opp'n at 12.) The Government offers three theories for admitting the body armor: (1) that it constituted evidence of illegal gun possession; (2) that it was evidence of criminal possession of stolen property; and (3) that it was evidence of the conduct charged in the superseding indictment. (Id. at 13-14; Gov't Supp. Mem. at 10.)

## III.    ANALYSIS

On a motion to suppress, the defendant bears the initial burden of establishing that a government official acting without a warrant subjected him to a search or seizure. United States v. Arboleda, 633 F.2d 985, 989 (2d Cir. 1980) (citations omitted), cert. denied, 450 U.S. 917

(1981); United States v. Bayless, 921 F. Supp. 211, 213 (S.D.N.Y. 1996). Once the defendant has met this burden, the burden then shifts to the government to demonstrate by a preponderance of the evidence, Bayless, 921 F. Supp. at 213, that the search or seizure did not violate the Fourth Amendment, Arboleda, 633 F.2d at 989; see also United States v. Perea, 986 F.2d 633, 639 (2d Cir. 1993); United States v. Pena, 961 F.2d 333, 338-39 (2d Cir. 1992).

Here, the parties do not dispute that Defendant was subjected to a custodial arrest, a search, and the seizure of the body armor without a warrant. The only issue in dispute is whether the warrantless search and seizure violated the Fourth Amendment. Accordingly, the burden rests with the Government. See Bayless, 921 F. Supp. at 213.

### A.    Initial Arrest

The parties contest whether the initial arrest was justified. A warrantless arrest of an individual in a public place for a felony or a misdemeanor committed in the officer's presence is consistent with the Fourth Amendment, so long as the arrest is supported by probable cause. Atwater v. Lago Vista, 532 U.S. 318, 354 (2001) ("If an officer has probable cause to believe that an individual has committed even a very minor criminal offense in his presence, he may, without violating the Fourth Amendment, arrest the offender."). "Probable cause to arrest exists 'when the [arresting officers] have knowledge or reasonably trustworthy information of facts and circumstances that are sufficient in themselves to warrant a person of reasonable caution in the belief that (1) an offense has been or is being committed (2) by the person to be arrested.'" United States v. Ceballos, 812 F.2d 42, 50 (2d Cir. 1987). In determining whether probable cause existed, a court must consider "the facts available to the officer at the time of the arrest," Ricciuti v. N.Y.C. Transit Auth., 124 F.3d 123, 128 (2d Cir. 1997), and examine the totality of the circumstances, see Illinois v. Gates, 462 U.S. 213, 238 (1983).

Here, the Government argues that the officers had probable cause to arrest Defendant for littering. (Gov't Mem. in Opp'n at 9-10; Gov't Supp. Mem. at 6.) New York City Administrative Code Section 16-118(1) states in pertinent part, "[n]o person shall litter, sweep, throw or cast . . . any ashes, garbage, paper, dust or other rubbish or refuse of any kind whatsoever, in or upon any street or public place." N.Y. City Admin. Code § 16-118(1). Under New York Penal Law, littering is an arrestable offense if committed in the presence of an officer. See, e.g., United States v. Rodriguez, 368 F. App'x 178, 180 (2d Cir. 2010) (summary order) (affirming the district court's finding that officers had probable cause to arrest the defendant for littering). According to the Government, the officers observed Defendant throw what appeared to be a food wrapper onto the ground in their presence after responding to the 911 call. (Gov't Mem. in Opp'n at 9-10; Gov't Supp. Mem. at 7.) At that point, they had probable cause to believe that the crime of littering had occurred and that Defendant had committed it. Id.

Defendant does not dispute that the police may lawfully arrest an individual who litters in their presence, but rather he attacks the credibility of Officer Anchundia's testimony that he observed Defendant littering. (See Def. Supp. Mem. at 7-8.) Defendant argues that it is implausible to think that he would have littered in plain view of the officers while wearing body armor, thereby giving the police an excuse to stop and frisk him. (Id. at 8.) Defendant notes that Officer Anchundia could not offer a detailed description of the wrapper. (Id.) He adds that police conduct was inconsistent with the claim that littering was witnessed. Specifically, Officer Anchundia conceded that he did not collect the evidence of the crime (i.e., the wrapper) for which he arrested Defendant. (Id.) Neither did Lieutenant Fioravante. Defendant postulates that "the police never actually witnessed any littering and decided to arrest him solely to investigate

the body armor." (Id. at 9.) Defendant seeks to buttress his theory by arguing that the littering charge was never pursued after the events in question. (Id.)

The court is not convinced by Defendant's arguments. To begin, the court finds Officer Anchundia's testimony about the events at issue to be credible. His demeanor was measured and professional. The police officer recounted numerous details about the arrest and about Defendant's behavior. Furthermore, Officer Anchundia's testimony is corroborated by other evidence produced at the hearing. The testimony is corroborated by the fact that Officer Anchundia was specifically patrolling for quality of life violations at the time of the incident (Tr. 5), such that a crime of littering would be squarely in his bailiwick. It is also corroborated by testimony of Lieutenant Fioravante, who testified that upon his arrival on the scene, Officers Anchundia and Ouk explained to him that Defendant had littered in their presence. (Id. at 20-21, 82.) Officer Anchundia's notes in his memo book are also consistent with the above testimony. The memo book, introduced into evidence at the hearing, contains notes that Defendant was observed to have "spit and litter." (Id. at 69; Gov't Ex. 8.) Finally, the summons issued to Defendant states that he was "observed throwing paper trash on public sidewalk." (Gov't Ex. 6.) Any contradictions in Officer Anchundia's testimony about the precise order of events are trivial.

Next, the officers' failure to collect the wrapper is not necessarily inconsistent with the claim that officers observed Defendant litter, as Defendant argues. (See Def. Supp. Mem. at 10.) The Government counters that the oversight is excusable because at all relevant times the officers were so concerned with their safety given the suspicion that Defendant was armed and a gathering crowd of onlookers. (Gov't Supp. Mem. at 8; see Tr. 17, 54, 83.) Although Defendant convincingly challenges these arguments, noting that the crowd did not begin to gather until after Defendant was handcuffed (id. at 53) and that Defendant was cooperative and respectful (id. at

10

52.), the question is not whether the failure to collect the wrapper was justified. The question is whether the absence of the evidence of the littering suggests that there was an absence of probable cause to arrest Defendant. The court finds that the absence of the wrapper weakens the Government's case, but it is not fatal. As already mentioned, the court credits the testimony of Officer Anchundia and Lieutenant Fioravante, which is adequately corroborated by several exhibits presented at the evidentiary hearing. Furthermore, Officer Anchundia conceded at the hearing that failure to collect the wrapper was a "mistake." (Id. at 19.) The court finds that there were sufficient facts presented at the hearing to establish probable cause, even in the absence of the wrapper.

Finally, the ultimate disposition of the littering charge does not affect the analysis of whether there was probable cause to arrest Defendant in the first instance, as Defendant would have it. The principal consideration in the determination of probable cause are the facts available to the officer "at the time of the arrest," Ricciuti, 124 F.3d at 128. The ultimate disposition of the charges is truly irrelevant. See Winfield v. United States, 430 F.Supp. 912, 914 (S.D.N.Y. 1977). Therefore, while Officer Anchundia did not know the disposition of the littering charge (id. at 40) and did not personally appear in court for that case (id. at 41-42), it does not follow that there was no probable cause to arrest Defendant on October 7, 2008.[6] As already discussed, the court finds that there were sufficient evidence presented at the evidentiary hearing to establish that the officers had probable cause to arrest Defendant for littering in their presence.

---

[6] An exhibit not admitted at the hearing but provided to the court with the hard copy Government's legal brief (Gov't Ex. 3500-SO-2) demonstrated that Defendant's littering charge was resolved with an ACD. Under N.Y. Crim. Proc. Law § 170.55, an ACD "leaves open the question of the accused's guilt," Singleton v. City of New York, 632 F.2d 185, 193 (2d Cir. 1980), and is not considered to be a favorable outcome, see Daniel v. Safir, 175 F. Supp. 2d 474, 480 (E.D.N.Y. 2001), aff'd, 42 F. App'x 528 (2d Cir. 2002).

11

**B.     Search Incident to Arrest**

The Government next argues that the seizure of the vest was justified as a product of a lawful search incident to arrest. (Gov't Mem. in Opp'n at 12.)  Under this doctrine, where police officers have probable cause to effect a custodial arrest, they may search the suspect without a warrant incident to that arrest.  United States v. Robinson, 414 U.S. 218 (1973) (holding that a lawful custodial arrest establishes the authority to search the person).  So long as the initial custodial arrest is based on probable cause, authority to conduct such a search incident to that arrest does not turn on the probability that weapons or evidence will be discovered.  Id. at 235. While the custodial arrest and the warrantless search must be "substantially contemporaneous," Shipley v. California, 395 U.S. 818, 820 (1969), the search can take place either at the scene of the arrest or later at the police station, United States v. Edwards, 415 U.S. 800, 807 (1974).

A police officer may seize personal effects discovered during a search incident to arrest if the officers find that these are evidence of criminal conduct, even if unrelated to that for which a suspect had been arrested.  Robinson, 414 U.S. at 236; United States v. Gregg, 463 F.3d 160, 161 (2d Cir. 2006) (officers properly recovered a gun after a valid search incident to an arrest for unlawful use of a subway card).  Police officers are empowered to retain and preserve such evidence for a potential criminal proceeding during the suspect's incarceration.  See, e.g., Edwards, 415 U.S. at 806 ("When it became apparent that the articles of clothing were evidence of the crime for which [suspect] was being held, the police were entitled to take, examine, and preserve them for use as evidence.").  Furthermore, while the suspect is in custody, police officers may continue to analyze and inspect the seized items without a warrant.  See United States v. Jenkins, 496 F.2d 57, 73 (2d Cir. 1974), cert. denied, 420 U.S. 925 (1975) (holding that

12

when suspect was taken into custody on a gun charge, money seized from suspect's wallet when he was "booked" was properly inspected by federal agents without a warrant).

In this case, having effected a custodial arrest for littering, Officer Anchundia had the authority to search Defendant both at the time of his arrest and later at the police station. (See Tr. 21, 28-29.) The custodial arrest also established the authority for Officer Anchundia to seize the body armor along with Defendant's other personal effects, at least for the duration of the custodial arrest. The police thus properly retained and continued to examine the body armor for potential signs that it was stolen property while Defendant was being held and processed pursuant to the littering charge.

## C. Permanent Seizure of the Body Armor

Contrary to the Government's argument, however, the search incident to arrest doctrine cannot justify what became a permanent seizure of the body armor. Upon Defendant's release from the precinct with a summons, all of his personal effects—other than the body armor—were returned to him. (Id. at 34, 88.) By contrast, the body armor was transferred later that night or the next morning to Detective Fazzingo. (Id. at 87, 92.) Since the Government introduced the body armor into evidence at the suppression hearing (Gov't Ex. 1), it is plain that the deprivation of that item was permanent.

Thus, from the moment of Defendant's release from the precinct, the retention of the body armor by the police constituted permanent interference with Defendant's possessory interests in his property, constituting a permanent seizure. See Soldal v. Cook County, Ill.. 506 U.S. 56, 61 (1992) (a seizure of property "occurs when 'there is some meaningful interference with an individual's possessory interests in that property'" (quoting United States v. Jacobsen, 466 U.S. 109, 113 (1984)). This permanent seizure cannot be justified by the search incident to

13

arrest doctrine, as the Government contends, because the temporal scope of legal authority incident to arrest is not limitless. Even under a liberal reading of the "contemporaneous" requirement, the legal authority to search incident to arrest expired when Defendant was released from police custody. See Edwards, 415 U.S. at 807 ("[O]nce the accused is lawfully arrested and *is in custody*, the effects *in his possession at the place of detention* . . . may lawfully be searched and seized without a warrant . . . .") (emphasis added).

Even if the court accepts the Government's contention that the police officers did not need a warrant, (Gov't Supp. Mem. at 11 n.6), the permanent seizure is justified only upon a showing of probable cause. See United States v. Place, 462 U.S. 696, 701 (1983) (law enforcement officers' retention of a suitcase for over ninety minutes constituted an extensive seizure that required probable cause); United States v. Gamble, 388 F.3d 74, 76 (2d Cir. 2004). Probable cause to seize property exists when "the facts available to the officer would warrant a man of reasonable caution in the belief that certain items may be contraband or stolen property or useful as evidence of a crime." Texas v. Brown, 460 U.S. 730, 742 (1983) (internal quotations and citations omitted). Probable cause may be based on a tip from a confidential or anonymous informant, provided that the tip is sufficiently reliable. See Oliveira v. Mayer, 23 F.3d 642, 647 (2d Cir. 1994); see also United States v. Walker, 7 F.3d 26, 30-31 (2d Cir. 1993) (anonymous telephone tip needs to possess sufficient indicia of reliability to support even a reasonable suspicion of criminal activity). Indicia of reliability are deemed to exist where the substance of the anonymous tip is corroborated by subsequent investigation or observations of police officers. See, e.g., Alabama v. White, 496 U.S. 325 (1990). Although corroboration of unincriminating facts can be sufficient to establish probable cause, see Gates, 462 U.S. at 243-44, bare identifying

14

information is not enough to establish even the lower reasonable suspicion standard. Florida v. J.L., 529 U.S. 266, 271 (2000).

The Government concedes that probable cause was required to seize the body armor. Because the wearing of body armor was not a criminal offense under the circumstances,[7] the Government argues that at the time of the seizure the officers had probable cause to believe that the body armor constituted evidence of (1) illegal gun possession; (2) criminal possession of stolen property; and (3) conduct charged in the superseding indictment. (Gov't Supp. Mem. at 12-14.) The court addresses each of these theories in turn.

### 1.    Body Armor as Evidence of Gun Possession

First, the Government argues that once Defendant was searched incident to his arrest and discovered to be in possession of body armor, the officers then had probable cause to believe that the body armor was evidence of a crime of illegal gun possession. (Id. at 12-13.) The Government argues that Defendant was encountered pursuant to the 911 transmission about a man with a gun and he matched the description. The Government argues that although Defendant did not have a weapon in his possession when stopped, "he had had ample opportunity to dispose of it before officers arrived." (Id. at 13.) Regardless, given Defendant's violent background, which was known to Lieutenant Fioravante, and the fact that he matched the caller's description, the officers were entitled to seize the vest as *potential* evidence of the crime of gun possession." (Id. (emphasis added).) The Government postulates that "[h]ad Detective Fazzingo not served a subpoena for the vest, the NYPD might have investigated the gun charge further, possibly by attempting to locate the 911 caller." (Id.)

---

[7] Specifically, wearing of body armor is not a criminal offense under New York Penal Law, unless it is worn during the commission of a violent felony. (Tr. 28, 89; see N.Y. Penal Law § 270.20 (McKinney).) In this case the officers conceded that at the time of his arrest Defendant was not wearing it during the commission of such a crime. (Tr. 56.)

Defendant counters that "there is no logic or support for the proposition that possession of body armor—which is not illegal—constitutes proof of illegal gun possession." (See Def. Supp. Mem. at 10.) Defendant notes that no gun was recovered. (Id.) He adds that while a person's possession of body armor may reasonably imply a concern for his own safety, it does not necessarily imply that he himself posed a threat to others. (Id.) Defendant notes that he was not charged or even arrested for illegal gun possession. (Id.)

The essence of the state and federal statutes cited by the Government prohibit the *possession* of firearms. See N.Y. Penal Law § 265.01 (McKinney); 18 U.S.C. § 922(g)(1). To establish probable cause that an item is evidence of these crimes, a reasonable person must conclude that it furnishes some proof that a suspect possessed a firearm. Certainly, in the ordinary case the item that gives rise to probable cause is the firearm itself. See, e.g., Gregg, 463 F.3d at 161. One can imagine that even in the absence of a gun, where there is an anonymous tip about an armed person, other items in the possession of a suspect, such as ammunition, shell casings, a holster, or gun powder residue could corroborate the tip, establishing probable cause of firearm possession.

The court finds that probable cause of gun possession was not established in this case. The anonymous tip was bare, containing only a location, identifying information, and an allegation about the weapon. (Tr. 7, 25-26, 78; Gov't Ex. 7.) Because bare identifying information is not enough to establish even reasonable suspicion, Florida v. J.L., 529 U.S. at 271, the officers would need to adequately corroborate the tip to establish probable cause. That corroboration was absent here. After arresting Defendant for littering, the officers searched him incident to that arrest, but did not recover a gun. (Tr. 52.) Nor did they recover ammunition or shell casings or a holster or gun powder residue. There was no eyewitness or video evidence

16

presented at the suppression hearing showing that Defendant had possessed a firearm shortly before his arrest, that he disposed of it, or that he admitted to any of the above. Rather, the only unusual item that officers recovered was the body armor.

However, it would be a leap of logic to conclude that the anonymous tip about an *armed* suspect was corroborated by an officer's recovery of only *body armor*. As Defendant convincingly argues, the possession of body armor—without any other incriminating paraphernalia—suggests a concern for one's own safety and does not necessarily imply one possessed a weapon with which he poses a risk to others. (Id.) On these bare facts, the totality of the circumstances is insufficient establish probable cause that the body armor was evidence of the crime of gun possession.

## 2. Body Armor as Evidence of Stolen Property

Second, the Government argues that the officers had probable cause to believe that the recovered body armor was evidence of criminal possession of stolen property, given that the body armor was manufactured solely for use by military personnel and not authorized for sale to civilians. (Gov't Mem. in Opp'n at 13-14; Gov't Supp. Mem. at 12.) The Government asserts that the vest recovered from Herron was Point Blank brand body armor produced in 2002 for exclusive use by the military. (Gov't Mem. in Opp'n at 8 n.6.) The inside of the vest contained an instruction panel that the Government alleges reflected a military contract number indicating that the vest was not available for purchase by a civilian. (Id.)

Defendant counters that the Government's theory is meritless because Officer Anchundia acknowledged that he was unable to find any evidence that it had been stolen. (See Def. Supp. Mem. at 11.) Defendant insists that mere speculation that the vest was stolen is insufficient to justify its seizure. (Id.)

17

The evidence presented at the evidentiary hearing failed to offer support for the Government's theory. The evidentiary hearing demonstrated that Defendant indeed possessed a large, "high power[ ]" vest, larger than standard-issue police vests. (Tr. 31.) Officer Anchundia testified that the body armor was an unusual item to recover from a person on the street. (Id. at 61.) Lieutenant Fioravante testified that it "looked like a military vest." (Id. at 85.) Although the inside of the vest contained an instruction panel that contained a contract number, date of manufacture, and cleaning instructions (Gov't Ex. 2), the Government did not present evidence that the body armor was produced "for exclusive use by the military" and "not available for purchase by a civilian," as argued in its brief. There was no evidence presented about the meaning of the contract number, the distribution of this type of body armor, or its lack of availability on a secondary market. On the contrary, Officer Anchundia conceded that he had "no clue" about the sale of such a vest. (Tr. 32.)

Furthermore, although they continued to investigate the body armor for about one hour while Defendant was detained on the littering charge, the officers were unable to find any support for their suspicion that it was stolen. (Id. at 32, 88.) At the conclusion of this investigation, Defendant was not charged or arrested for the crime of possession of stolen property. On such a record, the court concludes that probable cause has not been established because the totality of the circumstances, viewed objectively, does not warrant a belief that the body armor was stolen.

3.    Body Armor as Evidence of Criminal Conduct Charged in the Superseding Indictment

Finally, the Government argues that at the time the vest was seized there was probable cause to believe that the body armor was evidence of Defendant's "criminal conduct charged in the superseding indictment." (Gov't Mem. in Opp'n at 14; Gov't Supp. Mem. at 13.) Relying

on the collective knowledge doctrine, the Government contends that at the time of the seizure, Lieutenant Fioravante knew from Detective Fazzingo that there was an ongoing federal investigation into Defendant's activities involving narcotics and homicide. (Gov't Supp. Mem. at 14).

Defendant counters that Lieutenant Fioravante offered only vague assertions at the evidentiary hearing about the federal investigation into Defendant's condut to justify the seizure of the body armor. (See Def. Supp. Mem. at 11-12.) Defendant argues that these statements lack any specificity about the other crimes supposedly under investigation. (Id.) Defendant adds that the officers' testimony indicates that they seized the body armor merely on suspicion of some generalized misconduct by Defendant. (Id.)

As an initial matter, the superseding indictment at issue was not returned until February 13, 2012—three and a half years after the incident in question—presumably after extensive further investigation over those years. (See Superseding Indictment (Dkt. 217).) This superseding indictment charges Defendant with twenty-three counts related to leading a racketeering enterprise over the course of a twelve-year period, responsible for the commission of murder, attempted murder, robbery, extortion, assault, and narcotics trafficking. (Id.) By the Government's logic, at the time of the seizure of the body armor the officers would have had to know that although not illegal to wear, it was evidence of criminal conduct charged in one of the twenty-three counts three and a half years later.

However, the officers' testimony at the evidentiary hearing demonstrated that their knowledge about the conduct charged in the indictment was quite vague. Officer Anchundia testified that he had never seen Defendant and had never heard of him before. (Tr. 9, 50, 65.) For his part, Lieutenant Fioravante testified that he knew that Defendant had a "history of being

known to be violent" because five months earlier, in May 2008, he had observed Defendant in possession of an illegal gravity knife, for which Defendant was arrested. (Id. at 83.) Lieutenant Fioravante also testified that in May 2008 he had spoken to Detective Joseph Fazzingo from the "narcotics major case squad" and heard "of different investigations, ongoing [federal] investigations that were occurring with Ronald Herron and other individuals." (Id. at 84.) Lieutenant Fioravante added that he heard "from other units within the police department" about "other investigations that possibly [Defendant] was involved with." (Id. at 94.) Lieutenant Fioravante also testified that even apart from his later stationhouse call to Detective Fazzingo, he might have "possibly" retained the vest due to Defendant's "prior background, his prior history." (Id. at 91.) This testimony suggests that Lieutenant Fioravante possessed only a vague understanding of Defendant's alleged prior bad acts at the time of the seizure. Lieutenant Fioravante was unable to articulate any credible nexus between the body armor and any of the "different investigations" involving Defendant that would establish probable cause. (Id. at 84.)

The Government suggests that Lieutenant Fioravante's limited knowledge is not determinative because under the collective knowledge doctrine Detective Fazzingo's more detailed knowledge of the case against Defendant should be imputed to Lieutenant Fioravante as a result of their phone conversation. (Gov't Supp. Mem. at 14.) The collective knowledge doctrine allows for the imputation of knowledge between officers when one officer, having acquired probable cause, instructs another officer to conduct a search or arrest, even if the latter is far less informed. See United States v. Hensley, 469 U.S. 221, 231 (1985); United States v. Colon, 250 F.3d 130 (2d Cir. 2001). In other words, the probable cause determination is based upon the actual knowledge of the officer who issued the instruction. See Colon, 250 F.3d at 136 ("[A]pplication of the imputed knowledge doctrine requires that at some point along the line,

some law enforcement official—or perhaps some agglomeration of such officials—involved must possess sufficient information to permit the conclusion that a search or arrest is justified.").[8]

As the Government notes, while Defendant was detained, Lieutenant Fioravante telephoned Detective Fazzingo and informed him that Defendant was in custody, was being issued a summons, and had been wearing a bulletproof vest. (Tr. 86.) Asked why he thought the bulletproof vest might have significance in connection with the investigation involving Detective Fazzingo, Lieutenant Fioravante said "I believed if [Defendant] was someone wearing a bulletproof vest, it could be either for protection from maybe retaliation with regards to homicides, with regards to drug trafficking. I figured it would help the [federal] case." (Id. at 87.) Lieutenant Fioravante testified that he believed it was "the right thing to do, to have the vest vouchered" after Detective Fazzingo signaled his intention to get a "federal subpoena." (Id. at 90.) As a result, after releasing Defendant from the police station, Lieutenant Fioravante retained the vest "based on the authority of Detective Fazzingo." (Id.)

Although Lieutenant Fioravante's testimony sheds light on his state of mind, it does little to reveal whether Detective Fazzingo had probable cause that can be imputed to Lieutenant Fioravante under the collective knowledge doctrine. The Government did not offer testimony from Detective Fazzingo at the evidentiary hearing and was unable to articulate which counts in the twenty-three count indictment the body armor implicated. The only fact known about Detective Fazzingo's authority that could be imputed to Lieutenant Fioravante was that Detective Fazzingo intended to take possession of the body armor pursuant to a grand jury subpoena. However, a grand jury subpoena does not require any showing of probable cause. See United

---

[8] The doctrine is usually limited to cases in which officers are collaborating in some manner on an investigation. See, e.g., Savino v. City of New York, 331 F.3d 63, 69 (2d Cir. 2003) (stating that "where law enforcement authorities are cooperating in an investigation . . . the knowledge of one is presumed shared by all") (internal citations omitted). There was no indication apart from the two conversations between Lieutenant Fiorvante and Detective Fazzingo that they were cooperating on an investigation of Defendant.

States v. R. Enters., 498 U.S. 292, 297 (1991). On this record, the court is unable to conclude that Detective Fazzingo possessed probable cause that the body armor was evidence of a particular offense later charged in the superseding indictment, which would be imputed to Lieutenant Fioravante under the collective knowledge doctrine and justify the seizure. The court agrees with Defendant's argument that the testimony at the evidentiary hearing indicated that police seized the body armor on suspicion of some generalized misconduct and without probable cause.

IV.  **CONCLUSION**

In sum, while Defendant was properly arrested for littering and searched incident to that arrest, the Government has been unable to meet its burden of demonstrating that the subsequent warrantless seizure of the body armor was based on probable cause of gun possession, stolen property, or charges in the superseding indictment.

For the foregoing reasons, the court GRANTS Defendant's Motion to Suppress the body armor seized from his person on October 7, 2008.

SO ORDERED.                                         s/Nicholas G. Garaufis
                                                    _____
Dated: Brooklyn, New York                           NICHOLAS G. GARAUFIS
       April 29, 2014                               United States District Judge

22