MANDATE

15-1089-cr
*United States v. Herron*

# UNITED STATES COURT OF APPEALS
# FOR THE SECOND CIRCUIT

### SUMMARY ORDER

**RULINGS BY SUMMARY ORDER DO NOT HAVE PRECEDENTIAL EFFECT. CITATION TO A SUMMARY ORDER FILED ON OR AFTER JANUARY 1, 2007, IS PERMITTED AND IS GOVERNED BY FEDERAL RULE OF APPELLATE PROCEDURE 32.1 AND THIS COURT'S LOCAL RULE 32.1.1. WHEN CITING A SUMMARY ORDER IN A DOCUMENT FILED WITH THIS COURT, A PARTY MUST CITE EITHER THE FEDERAL APPENDIX OR AN ELECTRONIC DATABASE (WITH THE NOTATION "SUMMARY ORDER"). A PARTY CITING A SUMMARY ORDER MUST SERVE A COPY OF IT ON ANY PARTY NOT REPRESENTED BY COUNSEL.**

At a stated term of the United States Court of Appeals for the Second Circuit, held at the Thurgood Marshall United States Courthouse, 40 Foley Square, in the City of New York, on the 14th day of February, two thousand nineteen.

PRESENT:  DENNY CHIN,
          SUSAN L. CARNEY,
                *Circuit Judges*,
          BRIAN M. COGAN,
                *District Judge.*[*]

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -x

UNITED STATES OF AMERICA,
        *Appellee*,

        v.                                                  15-1089-cr

RONALD HERRON, also known as
RA, also known as RA DIGGS, also known
as RA DIGGA, also known as RAHEEM,
        *Defendant-Appellant*,

---

[*] Judge Brian M. Cogan, United States District Court for the Eastern District of New York, sitting by designation.

MANDATE ISSUED ON 06/29/2020

TYRONE WILSON, also known as BISCUIT, also known as YOUNG BRICKY, JOSEPH GARCIA, also known as JO JO, MUSA MARSHALL, also known as SLIM, CRYSTAL LEWIS, also known as EBB, VERDREEA OLMSTEAD, also known as AUNTIE, JOSEPH RANDOLPH, also known as RIZZLE, JOSEPH VALENTIN, also known as J, TYHE WALKER, also known as G.I.B., also known as GUY IN THE BUSHES, ALGENIS CARABELLO, also known as HIGH-HENNY, JORGE MEJIA, also known as MOOSE, also known as MUSSOLINI, SHONDELL WALKER, also known as M-DOT,

         *Defendants.*

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -x

| | |
|---|---|
| FOR APPELLEE: | J.E. SHREVE ARIAIL, Assistant United States Attorney (Susan Corkery, Samuel P. Nitze, Rena T. Paul, Assistant United States Attorneys, *on the brief*), *for* Richard P. Donoghue, United States Attorney for the Eastern District of New York, Brooklyn, New York. |
| FOR DEFENDANT-APPELLANT: | KELLEY J. SHARKEY, Law Office of Kelley J. Sharkey, Esq., Brooklyn, New York. |

Appeal from the United States District Court for the Eastern District of New York (Garaufis, *J.*).

**UPON DUE CONSIDERATION, IT IS HEREBY ORDERED, ADJUDGED, AND DECREED** that the judgment of the district court is **AFFIRMED.**

Defendant-appellant Ronald Herron appeals from a judgment of conviction, entered April 8, 2015, after a five-week jury trial. Herron was convicted of

2

murder, firearms, racketeering, robbery, and drug offenses arising out of activities associated with the "Murderous Mad Dogs Bloods" gang (the "MMDB") and its control of the drug trade in the Wyckoff and Gowanus Houses in Brooklyn, New York. He was sentenced principally to life imprisonment plus 105 years.[1] We assume the parties' familiarity with the underlying facts, procedural history, and issues on appeal.

The government presented evidence that, from the late 1990s until 2011, Herron headed a drug distribution and racketeering conspiracy centered around the Wyckoff and Gowanus Houses. The evidence showed that:

- Herron ran a cocaine distribution business out of 423 Baltic Street in Brooklyn, where he lived with his mother.

- Herron murdered a drug dealing competitor, Frederick Brooks, by shooting him in the head in 2001. Although Herron was later acquitted of the murder, he and his associates threatened key witnesses, who stopped cooperating with the state prosecution as a result. Herron was convicted, however, on a related drug charge in November 2002, and remained in prison until 2007, during which time he became a high-ranking member of the MMDB.

- Upon his release from prison in 2007, Herron robbed Joseph Garcia at gunpoint in an effort to reestablish control over the 423 Baltic drug market.

---

[1] Herron's convictions carried with them several life sentences, running consecutively to some counts and concurrently with others, as well as mandatory minimum consecutive sentences for certain gun counts.

3

- Herron murdered Richard Russo by shooting him in the head on May 9, 2008. Russo had told Herron's associates that he would kill Herron if he ever confronted him.

- Herron murdered Victor Zapata at 185 Nevins Street, after Zapata attacked and shot one of Herron's top lieutenants, Jorge Mejia.  Herron's presence at the murder scene was established through government cell-site evidence.

Herron took the stand and denied murdering Brooks or engaging in any illegal activity after his November 2002 conviction on drug charges.  Instead, he testified that he tried to turn his life around in prison and that upon his release in 2007, he devoted himself to a rap career.  He admitted joining the MMDB, but only to protect himself while in prison and to further his music career, rather than for any illegal purpose.

Herron raises a host of issues on appeal:  (1) he was denied his Sixth Amendment right to compulsory process with respect to two witnesses who invoked their Fifth Amendment right against self-incrimination; (2) music and promotional videos related to his rap music career were erroneously admitted into evidence; (3) the district court erred in denying his motion to suppress cell-site evidence; and (4) his predicate convictions were improperly considered "crimes of violence" under 18 U.S.C. § 924(c). Addressing each issue in turn, we conclude that Herron's challenges lack merit.

4

I.      **Sixth Amendment**

Herron argues that the district court violated his Sixth Amendment right to compulsory process by permitting two witnesses, Diane Flowers and Stacey Knight, to invoke their Fifth Amendment privilege against self-incrimination without adequate inquiry into the basis of their claim of privilege.

"We review [Herron's] constitutional claim[] *de novo*, but accept [the] district court's factual findings unless they are clearly erroneous." *United States v. Desena*, 287 F.3d 170, 176 (2d Cir. 2002). "To establish a Sixth Amendment violation" in this context, "a defendant must demonstrate that he was deprived of the opportunity to present a witness who would have provided testimony that was both material and favorable to his defense," *Howard v. Walker*, 406 F.3d 114, 132 (2d Cir. 2005) (internal quotations omitted), "in ways not merely cumulative to the testimony of available witnesses," *United States v. Ginsberg*, 758 F.2d 823, 831 (2d Cir. 1985) (quoting *United States v. Valenzuela-Bernal*, 458 U.S. 858, 873 (1982)).

Relying on *United States v. Zappola*, Herron argues that the district court erred by failing to "undertake a particularized inquiry" to determine whether the Fifth Amendment assertions by Flowers and Knight were "founded on a reasonable fear of prosecution as to each of the . . . questions" defense counsel sought to ask. 646 F.2d 48, 53 (2d Cir. 1981).

5

As to Flowers, Herron's Sixth Amendment claim was waived. On advice of counsel, Flowers indicated that she would not appear voluntarily and she would invoke the Fifth Amendment in response to any questions inquiring into a privileged subject area. Herron's counsel indicated on the record that it was not his "intention to put [Flowers] on the stand under subpoena" and it was his understanding "that [as to] the specific questions [defense counsel was] going to put to her," *i.e.*, "whether or not she received a gun [or] handed guns to somebody else, that she would invoke the Fifth Amendment with respect to those questions." G. App. at 127. On that basis, counsel for Herron indicated that he was "finish[ed] with that witness." *Id.* Herron never attempted to subpoena Flowers. Therefore, he cannot now complain that he was denied process to compel Flowers to testify.

As to Knight, Herron argues that the district court's consideration of Knight's invocation of the Fifth Amendment was *pro forma*. There was sufficient evidence in the record, however, to support the district court's conclusion that Knight had a valid basis to invoke the Fifth Amendment. For example, evidence presented at trial indicated that Knight was a "godfather" to the MMDB (*i.e.*, the gang's top leader), Herron was a "general" for Knight in the MMDB, and Herron and certain of his associates had visited Knight in prison and had corresponded with him. Such facts formed a valid basis for the district court to conclude that Knight's answer to any substantive question about his relationship to Herron would expose him to a

6

"substantial and real . . . hazard[] of incrimination."  *United States v. Rodriguez*, 706 F.2d 31, 37 (2d Cir. 1983) (internal quotation marks omitted).  Therefore, the district court did not err in concluding that Knight's invocation of the Fifth Amendment was proper.  Moreover, even if the district court did err in this respect, Herron has not shown that Knight's testimony "would have been material and favorable to his defense, in ways not merely cumulative to the testimony of available witnesses."  *Ginsberg*, 758 F.2d at 831.

## II.     Rap and Promotional Videos

Herron argues that the district court erred by admitting into evidence certain music and promotional videos related to his rap music career on grounds that the evidence violated (1) his First Amendment right of free expression and (2) Federal Rule of Evidence 403.

The First Amendment limits the government's ability to regulate the content of speech.  *See Turner Broad. Sys., Inc. v. FCC*, 512 U.S. 622, 641 (1994).  It does not, however, "prohibit the evidentiary use of speech to establish the elements of a crime or to prove motive or intent."  *Wisconsin v. Mitchell*, 508 U.S. 476, 489 (1993).  "Evidence of a defendant's previous declarations or statements is commonly admitted in criminal trials subject to evidentiary rules dealing with relevancy, reliability, and the like."  *Id.*

We review a district court's evidentiary rulings for abuse of discretion.  *United States v. Curley*, 639 F.3d 50, 56 (2d Cir. 2011).  "[S]o long as the district court has

conscientiously balanced the proffered evidence's probative value with the risk for prejudice," a Rule 403 determination "will be disturbed only if it is arbitrary or irrational." *United States v. Awadallah*, 436 F.3d 125, 131 (2d Cir. 2006). We will vacate a conviction only if the error is not harmless. *See United States v. Mercado*, 573 F.3d 138, 141 (2d Cir. 2009).

Herron's First Amendment challenge "is meritless . . . because here the speech is not 'itself the proscribed conduct.'" *United States v. Pierce*, 785 F.3d 832, 841 (2d Cir. 2015) (quoting *United States v. Caronia*, 703 F.3d 149, 161 (2d Cir. 2012)). Herron's rap videos were "used to establish the existence of, and [his] participation in, the alleged RICO enterprise," and thus the First Amendment is not implicated. *Pierce*, 785 F.3d at 841.

The videos -- offered as evidence of Herron's participation in the charged conspiracies and crimes, his position as a leader of the MMDB, his familiarity with firearms and the drug trade, and his relationship to certain cooperating witnesses -- are plainly relevant.[2] The district court balanced the risk of prejudice from the profanity and offensive conduct in the videos against their probative value in concluding that Rule 403 did not bar their admission into evidence. *See United States v. Herron*, No. 10-

---

[2] The videos portray, *inter alia*, Herron and his affiliates glorifying their past crimes and prison sentences, bragging about their domination of the drug trade in the housing projects they controlled, threatening rival gangs with violence, and using firearms at a firing range. In one video, Herron is approached by a woman looking to buy drugs from him.

cr-615, 2014 WL 1871909, at *4-5 (E.D.N.Y. May 8, 2014).  Accordingly, the district court did not abuse its discretion in admitting the evidence under Rule 403.  *See Pierce*, 785 F.3d at 841 ("Rap lyrics . . . are properly admitted . . . where they are relevant and their probative value is not substantially outweighed by the danger of unfair prejudice.").

**III.     Cell-Site Evidence**

Herron next argues that the district court erred in denying his motion to suppress certain cell-site evidence that placed him in the vicinity of the Wyckoff Houses when Victor Zapata was murdered there in 2009.

"We review *de novo* the legal issues raised in a motion to suppress evidence." *In re Terrorist Bombings of U.S. Embassies in E. Afr.*, 552 F.3d 157, 167 (2d Cir. 2008).  "We review a district court's factual findings for clear error, viewing the evidence in the light most favorable to the government." *Id.*

Herron contends that the government's use in 2009 of an order issued under the Stored Communications Act (the "SCA"), 18 U.S.C. § 2703, to obtain cell-site records for his mobile phone violated his Fourth Amendment right to be free from warrantless searches and seizures.  The SCA permits the government to obtain such information, without a warrant, if it offers "specific and articulable facts showing that there are reasonable grounds to believe that the contents of a wire or electronic communication, or the records or other information sought, are relevant and material to an ongoing criminal investigation." 18 U.S.C. § 2703(d).

9

Herron argues that the government's obtaining of 43 days of cell-site records amounted to a search within the meaning of the Fourth Amendment, and thus required a warrant supported by probable cause. The Supreme Court has recently instructed that the government must generally obtain a warrant, based on a probable cause showing, to obtain cell-cite records from a third party. *Carpenter v. United States*, -- U.S. --, 138 S. Ct. 2206, 2221 (2018). Nevertheless, the good faith exception to the exclusionary rule applies here. *See United States v. Zodhiates*, 901 F.3d 137, 143 (2d Cir. 2018) (holding that the good faith exception to the exclusionary rule applies to cell-cite location information obtained in 2010 pursuant to § 2703(d) of the SCA because the search was made in "objectively reasonable reliance on appellate precedent existing at the time of the search"); *see also United States v. Curtis*, 901 F.3d 846, 849 (7th Cir. 2018) ("[T]hough it is now established that the Fourth Amendment requires a warrant for the type of cell-phone data present here, exclusion of that information was not required because it was collected in good faith.").

The good faith exception applies unless § 2703(d) was "clearly unconstitutional" with respect to cell-cite records at the time the government applied for the order in 2009. *Illinois v. Krull*, 480 U.S. 340, 349-50 (1987). Herron, however, only points to post-2009 cases in support of his argument. He has failed to establish that § 2703(d) was clearly unconstitutional as applied to him in 2009, when the government applied for the order in accordance with the statute and obtained the records. *Id.* at 350

10

("If the statute is subsequently declared unconstitutional, excluding evidence obtained pursuant to it prior to such a judicial declaration will not deter future Fourth Amendment violations" and, thus, the exclusionary rule does not apply).

Herron further argues that the government is not entitled to the good faith exception because its § 2703(d) application failed to disclose that it sought his cell-site records to investigate the murder of Victor Zapata, rather than the drug distribution conspiracy detailed in the application. Zapata's murder, however, was bound up in the conspiracy. Furthermore, Herron has not shown that the alleged omission in any way "knowingly misled" the issuing magistrate judge such that the good faith exception should not apply. *United States v. Falso*, 544 F.3d 110, 125 (2d Cir. 2008).[3]

## IV. Crime of Violence

Lastly, Herron challenges his firearms convictions on Counts Seven, Ten, Fourteen, and Nineteen on the grounds that the "risk-of-force clause" of 18 U.S.C. § 924(c)(3)(B) is unconstitutionally vague and New York State murder and Hobbs Act robbery are not "crimes of violence" because they do not satisfy § 924(c)(3)(A)'s "force clause." He must be correct in both respects to prevail on appeal.

---

[3] In a letter dated July 29, 2018, filed pursuant to Federal Rule of Appellate Procedure 28(j), Herron, for the first time, argues that a Sixth Circuit opinion precludes application of the exclusionary rule. *Warshak v. United States*, 490 F.3d 455 (6th Cir. 2007). That panel decision, however, was subsequently vacated *en banc* by the Sixth Circuit. *Warshak v. United States*, 532 F.3d 521 (6th Cir. 2008) (en banc).

We review questions of law *de novo*. *United States v. Fullwood*, 86 F.3d 27, 29 (2d Cir. 1996). Section 924(c) prohibits the use or carrying of a firearm in relation to, or possession of a firearm in furtherance of, a "crime of violence." 18 U.S.C. § 924(c)(1)(A). A "crime of violence" is defined as a felony that (1) "has as an element the use, attempted use, or threatened use of physical force against the person or property of another" (the "force clause") or (2) "by its nature . . . involves a substantial risk that physical force against the person or property of another may be used in the course of committing the offense" (the "risk-of-force clause").[4] *Id.* § 924(c)(3)(A)-(B).

Two of our recent decisions are relevant to Herron's arguments. In *United States v. Hill*, 890 F.3d 51 (2d Cir. 2018), we applied the force clause of § 924(c) to a conviction for Hobbs Act robbery. We held that Hobbs Act robbery categorically qualifies as a "crime of violence" within the meaning of § 924(c)(3)(A). *Id.* at 60. In *United States v. Barrett*, 903 F.3d 166 (2d Cir. 2018), we held that (1) Hobbs Act robbery conspiracy categorically qualifies as a "crime of violence" within the meaning of § 924(c) without implicating the concerns raised by the Supreme Court in *Johnson v. United States*, 135 S. Ct. 2551 (2015), and *Sessions v. Dimaya*, 138 S. Ct. 1204 (2018); and (2) § 924(c)(3)(B) can be applied in a "case-specific" way that "avoids both the Sixth

---

[4] The risk-of-force clause is sometimes referred to as the "residual clause." *See, e.g., United States v. Barrett*, 903 F.3d 166, 175 (2d Cir. 2018).

12

Amendment right-to-trial and due process vagueness concerns" that animated *Johnson* and *Dimaya*. *Id.* at 177-78.

As to Herron's § 924(c) conviction on Count Ten, which is predicated on Hobbs Act robbery, Herron's argument that his § 924(c) conviction should be vacated because § 924(c)'s force clause does not apply to Hobbs Act robbery is foreclosed by our decision in *Hill*. *Hill* makes clear that Hobbs Act robbery is categorically a crime of violence under § 924(c)(3)(A). *Hill*, 890 F.3d at 60. Thus, Herron's argument as to Count Ten fails.

Herron also argues that his § 924(c) convictions on Counts Seven, Fourteen, and Nineteen do not categorically constitute crimes of violence under § 924(c)(3)(A). These counts are predicated on murder-in-aid-of-racketeering and drug-related murder, which themselves are federal crimes predicated on New York State murder. Because an individual can intentionally kill using, for example, poison, starvation, or exposure to hazardous materials, Herron argues that New York State murder does not require "physical force." There exist at least two paths of analysis for considering whether Herron's predicate acts are "crimes of violence" for purposes of § 924(c): (1) the categorical approach under § 924(c)(3)(A), the force clause, or (2) the

13

Case 1:10-cr-00615-NGG   Document 742   Filed 06/29/20   Page 14 of 16 PageID #: 10306

case-specific approach under § 924(c)(3)(B), the risk-of-force clause, as adopted in *Barrett*. Here, we apply the second approach.[5]

*Barrett* instructs that § 924(c)(3)(B) "can be applied to a defendant's case-specific conduct, with a jury making the requisite findings about the nature of the predicate offense and the attending risk of physical force being used in its commission." *Barrett*, 903 F.3d at 178. Although the jury did not make a conduct-specific § 924(c)(3)(B) determination here, any error in failing to require the jury to make such a finding was harmless beyond a reasonable doubt. *See id.* at 184.

Herron's conduct attributable to the murder-in-aid-of-racketeering and drug-related murder counts underlying Counts Seven, Fourteen, and Nineteen constitute crimes of violence under *Barrett*'s conduct-specific approach to § 924(c)(3)(B)'s risk-of-force clause. The jury convicted Herron of both murder-in-aid-of-racketeering and drug-related murder for each of Frederick Brooks, Richard Russo, and Victor

---

[5]   As to the first approach, we have not held in a precedential opinion that New York State murder is categorically a crime of violence under § 924(c)(3)(A), although we have done so in summary orders. *See United States v. Praddy*, 729 Fed. App'x 21, 24 (2d Cir. 2018) (summary order) (noting that "attempted murder is a crime unmistakably involving an attempted use of physical force" under § 924(c)(3)(A) (internal quotation marks omitted)); *United States v. Scott*, 681 Fed. App'x 89, 95 (2d Cir. 2017) (summary order) ("Attempted murder in the second degree is a crime unmistakably involving an attempted use of physical force within § 924(c)(3)(A)." (internal quotation marks omitted)).

Application of the categorical approach to the risk-of-force clause is unavailable to us. Although we did not expressly hold in *Barrett* that § 924(c)(3)(B) is unconstitutionally vague when applied as part of the categorical approach, we did hold that the principle of constitutional avoidance dictates that "identification of a crime of violence under § 924(c)(3)(B) is properly made by a jury on a conduct-specific basis" and, thus, not categorically by the court. *Barrett*, 903 F.3d at 182-83.

14

Zapata. Count Seven corresponds to the murder of Brooks, Count Fourteen corresponds to the murder of Russo, and Count Nineteen corresponds to the murder of Zapata. Herron murdered Brooks by shooting him with a firearm in the neck, back, and face on June 16, 2001, following a dispute over territory. Herron murdered Russo by shooting him with a firearm in the head on May 9, 2008, after concluding that Russo had disrespected him. Herron murdered Zapata by shooting him with a firearm multiple times in the torso and head on September 27, 2009, in retaliation for a shooting that Zapata committed against one of Herron's associates. The verdict sheet containing special interrogatories makes clear that the jury found that the government proved beyond a reasonable doubt that Herron "discharged a firearm" in connection with each murder. Because the jury found that the actions taken by Herron underlying each of his § 924(c) convictions involved the actual use of physical force -- firing a gun one or more times at the person of another, leading to that person's death -- the "evidence can only support a finding that the charged [crimes], by [their] nature, involved a substantial risk of the use of physical force." *Barrett*, 903 F.3d at 184 (internal quotation marks omitted). Thus, Herron's arguments as to Counts Seven, Fourteen, and Nineteen fail under a case-specific application of § 924(c)(3)(B).

\*   \*   \*

We have considered Herron's remaining arguments and find them to be without merit. For the reasons set forth above, we **AFFIRM** the district court's judgment.

FOR THE COURT:
Catherine O'Hagan Wolfe, Clerk of Court

A True Copy
Catherine O'Hagan Wolfe, Clerk
United States Court of Appeals, Second Circuit