UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

UNITED STATES OF AMERICA,

          -against-

RONALD HERRON,

                    Defendant.

**MEMORANDUM & ORDER**
**10-CR-615 (NGG)**
**22-CV-2538 (NGG)**

NICHOLAS G. GARAUFIS, United States District Judge.

Ronald Herron brings this Motion[1] for a writ of habeas corpus to vacate, set aside, or correct his sentence pursuant to 28 U.S.C. § 2255. (*See* Motion to Vacate ("Mot.s") (Dkt. 768); Claim Five (Dkt. 768-2); Amended Motion to Vacate ("Am. Mot.") (Dkt. 796-1).)[2] Herron also brings a Motion for Discovery pursuant to Rule 6 of the Rules Governing Section 2255 Proceedings. (*See* Motion for Discovery ("Disco. Mot.") (Dkt. 797-1).) The Government opposes Herron's Motion. (*See* Memorandum in Opposition ("Gov't Opp.") (Dkt. 803); Reply (Dkt. 806).) For the reasons that follow, the Motion is DENIED, the Motion for Discovery is DENIED, and Herron's request for a hearing is DENIED.

---

[1] Courts "generally refer to a habeas request under § 2255 as a 'motion,' [and] a habeas request under § 2254 as a 'petition.'" *Johnson v. United States*, 623 F.3d 41, 43 n.2 (2d Cir. 2010). Although Section 2255 requests are commonly referred to as either a "motion" or a "petition," the court will refer to Herron's habeas requests as a motion. Additionally, the court will refer to Herron's Original Motion and Amended Motion collectively as the "Motion."

[2] Docket references are to filings on Herron's criminal docket, No. 10-CR-615, rather than the civil docket for his habeas motion, No. 22-CV-2538.

## I. BACKGROUND

On June 16, 2014, a jury convicted Herron of every count in a 21-count Revised Sixth Superseding Indictment[3] charging him with murder, multiple firearms offenses, racketeering, robbery, and drug offenses arising out of his association with the "Murderous Mad Dogs" section of the Bloods gang and its control of the drug trade in the Wyckoff and Gowanus Houses in Brooklyn, New York. *See United States v. Herron*, 2 F. Supp. 3d 391, 394 (E.D.N.Y. 2014); *United States v. Herron*, 762 F. App'x 25, 27-28 (2d Cir. 2019). (*See* Judgment (Dkt. 621).) The court sentenced Herron to 12 life terms plus 105 years' imprisonment. *Herron*, 762 F. App'x at 28. (Judgment at 4.)

Herron appealed to the Second Circuit, arguing that: (1) the court violated his Sixth Amendment right to compulsory process by permitting two witnesses—Stacey Knight and Diana Flowers—to assert their Fifth Amendment privilege; (2) the court erred in admitting his rap music videos into evidence; (3) the court erred in denying his motion to suppress certain cell-site evidence; and (4) his convictions on Counts 7, 10, 14, and 19 under 18 U.S.C. § 924(c) should be vacated and dismissed because Section 924(c)'s residual clause is unconstitutionally vague and the charges underlying those Counts are not "crimes of violence." *See Herron*, 762 F. App'x at 28-32. The Second Circuit rejected those arguments and affirmed Herron's conviction on February 14, 2019. *See Herron*, 762 F. App'x at 33. The Supreme Court denied

---

[3] The Original Sixth Superseding Indictment contained 23 counts. (Original Sixth Superseding Indictment (Dkt. 217).) However, when the Government elected not to submit Counts 16 or 22 of the Original Sixth Superseding Indictment to the jury, it submitted a Revised Sixth Superseding Indictment reflecting its non-pursuit of those counts. (Gov't Letter re Revised Indictment (Dkt. 543); Revised Sixth Superseding Indictment ("S-6") (Dkt. 543-2); Gov't Opp. at 2 n.1.) Thus, the operative Revised Sixth Superseding Indictment contained 21 counts. (*See* S-6.)

certiorari on May 3, 2021. *Herron v. United States*, 141. S. Ct. 2605 (2021).

On May 3, 2022, Herron, through his attorney, filed a motion to vacate, set aside, or correct his sentence pursuant to 28 U.S.C. § 2255 (the "Original Motion"). (*See* Mot.) Herron argues that: (I) the Government violated the federal anti-bribery statute by "providing deals to unreliable murderers and drug dealers to testify"; (II) the Government withheld *Brady* material concerning Government witness Rafael Gonzalez and an individual Herron claims was convicted in connection with a 2008 murder at Douglas Street Pool; (III) newly discovered evidence in the form of an affidavit from "Mr. McFadden" shows that Government witness Saquan Wallace lied under oath; (IV) the Government obtained cell-site information in violation of the Fourth Amendment; and (V) trial counsel provided ineffective assistance by stipulating to the admissibility of a firearm at trial, failing to obtain alleged *Brady* evidence from the Government, and declining to call Mr. McFadden as a witness at trial. (*See* Mot. at 5-9; Claim Five.)

Herron filed his amended Section 2255 motion (the "Amended Motion") on November 3, 2023, arguing that: (I) his convictions for Counts 7, 14, and 19 pursuant to 18 U.S.C. § 924(c) should be vacated because Section 924(c)'s residual clause is unconstitutionally vague and the charges underlying those Counts are not categorically crimes of violence; (II) the Government withheld *Brady* material from the defense, namely, evidence that Government witness Vincent Winfield killed or was suspected of killing James Sykes at Douglas Street Pool in November 2008; (III) newly discovered evidence in the form of affidavits from Shanduke McPhatter and Diane Flowers undermine Herron's conviction; (IV) trial counsel rendered ineffective assistance when they failed to object to the testimony of cooperating witnesses who "only testified because the Government bribed witnesses by providing deals to unreliable murderers and drug

3

dealers"; and (V) Herron's life sentences for offenses committed while he was a minor violate the Eighth Amendment. (Am. Mot. at 1-10.) Herron requests a hearing on the foregoing allegations and, separately, moves for discovery in connection with his *Brady* claim. (*Id.* at 3, 11; Disco. Mot. at ¶¶ 6-11.) The Government filed its opposition on June 21, 2024. (*See* Gov't Opp.)

## II.  LEGAL STANDARD

Section 2255 allows individuals in federal custody to move to vacate, set aside or correct sentences that are imposed in violation of the Constitution or laws of the United States or are otherwise subject to collateral attack. 28 U.S.C. § 2255(a). Individuals seeking habeas relief "must clear a significantly higher hurdle than would exist on direct appeal." *United States v. Frady,* 456 U.S. 152, 166 (1982).[4] To qualify for relief under Section 2255, the defendant must show "a constitutional error, a lack of jurisdiction in the sentencing court, or an error of law or fact that constitutes a fundamental defect which inherently results in complete miscarriage of justice." *Cuoco v. United States*, 208 F.3d 27, 30 (2d Cir. 2000).

Importantly, "a § 2255 [motion] cannot be used to relitigate questions which were raised and considered on direct appeal," or which could have been, but were not, raised on direct appeal. *United States v. Pitcher*, 559 F.3d 120, 123 (2d Cir. 2009); *United States v. Thorn*, 659 F.3d 227, 231 (2d Cir. 2011) ("In general, a defendant is barred from collaterally challenging a conviction under § 2255 on a ground that he failed to raise on direct appeal."). However, an exception applies "if the defendant establishes (1) cause for the procedural default and ensuing prejudice or (2) actual innocence." *Thorn*, 659 F.3d at 231. "One claim that may appropriately be raised for the first time in a § 2255 motion,

---

[4] When quoting cases, unless otherwise noted, all citations and internal quotation marks are omitted, and all alterations are adopted.

whether or not the [defendant] could have raised the claim on direct appeal, is ineffective assistance of counsel." *Harrington v. United States*, 689 F.3d 124, 129 (2d Cir. 2012).

Additionally, Section 2255 imposes a one-year limitations period, which runs from the date on which the judgment of conviction becomes final.[5] 28 U.S.C. § 2255(f). When an individual amends an otherwise timely motion after the expiration of the statute of limitations, such amended claims "relate back" to the date of the original motion, and are not time-barred, if the original and amended motions arise out of the same "conduct, transaction, or occurrence." Fed. R. Civ. P. 15(c)(2). However, an amended motion does not qualify for relation back simply because "both the original [motion] and the amended [motion] arose from the same trial and conviction." *Mayle v. Felix*, 545 U.S. 644, 650 (2005). If the amended motion "asserts a new ground for relief supported by facts that differ in both time and type from those the original pleading set forth," it does not satisfy Rule 15(c) and will not relate back to the original motion. *Id.*

## III. DISCUSSION

Herron challenges his conviction on numerous grounds, raised in both his Original Motion and Amended Motion. Herron represents that his Amended Motion "amends and supplements his initial [motion]." (Not. of Mot. (Dkt. 796) ¶ 10.) The Government "understands [Herron] to be relying solely on the claims alleged in the Amended [Motion] as the bases for his Section 2255 application and replies only to those claims." (Gov't Opp. at 13 n.2.) However, because it is unclear to the court whether

---

[5] Herron's judgment of conviction became final on May 3, 2021, when the Supreme Court denied certiorari. *Herron v. United States*, 141. S. Ct. 2605 (2021); *see Clay v. United States*, 537 U.S. 522, 527 (2003) ("Finality attaches when this Court affirms a conviction on the merits on direct review or denies a petition for a writ of certiorari, or when the time for filing a certiorari petition expires.").

Herron intends his Amended Motion to supersede his Original Motion, the court will consider the arguments raised in both filings.

### A.  Procedurally Defaulted Claims

Several claims in Herron's Original and Amended Motions are procedurally barred, either because they were considered and rejected on direct appeal, because they could have been, but were not, raised on direct appeal, or because they do not "relate back" to the Original Motion, rendering those claims untimely. *See Pitcher*, 559 F.3d at 123; *Thorn*, 659 F.3d at 231; *Mayle*, 545 U.S. at 650. Herron provides no excuse for, or argument against, this default. He shows no "cause for the procedural default and ensuing prejudice," does not allege "actual innocence" on the basis of these alleged errors, nor does he show that a "complete miscarriage of justice" would result from the court's refusal to hear these claims. *Cuoco*, 208 F.3d at 30; *Thorn*, 659 F.3d at 231. Instead, Herron simply asserts that "there are no procedural bars to [his] arguments," and, "to the extent the Court finds any procedural bars do exist[,] . . . due process and credible jurisdiction claims should overcome [those] bars." (Reply at ¶¶ 2, 8.) These bare assertions do not excuse Herron's default. As such, several of Herron's claims—addressed individually below—are procedurally defaulted, and Herron cannot bring them in a collateral attack. *See Natal v. United States*, No, 18-CV-1572 (JBA), 2020 WL 1904708, at *4 (D. Conn. Apr. 17, 2020) ("As [defendant's] claims are procedurally defaulted, . . . the Court need not address the merits of these claims, nor conduct a § 2255(b) hearing on these issues.").

First, in his Amended Motion, Herron argues that Counts 7, 14, and 19 should be vacated and dismissed because Section 924(c)'s residual clause is unconstitutionally vague and the charges underlying those Counts are not categorically crimes of violence. (Am. Mot. at 1-2 (citing *United States v. Davis*, 588 U.S. 445

(2019)).) Counts 7, 14, and 19 are predicated on murder in aid of racketeering and drug-related murder, which are federal crimes predicated on New York Penal Law § 125.25(1), New York's murder statute.[6] *Herron*, 762 F. App'x at 32. (S-6 at 10-19.) The Second Circuit considered and rejected this argument on direct appeal, concluding that Counts 7, 14, and 19 are crimes of violence under the case-specific approach to Section 924(c). *Herron*, 762 F. App'x at 32-33. However, just four months after the Second Circuit's decision, the Supreme Court rejected the case-specific approach in favor of the categorical approach for assessing whether a predicate act qualifies as a "crime of violence" under Section 924(c). *Davis*, 588 U.S. at 454-55.

While the Second Circuit's decision on this issue evidently conflicts with *Davis*, Herron's claim is nevertheless procedurally barred because it is untimely. Herron raised the *Davis* issue for the first time in his Amended Motion, 1.5 years after his timely Original Motion. (Am. Mot. at 1-2; *see generally* Mot.; Claim Five.) There is no mention of *Davis*, Section 924(c), or Counts 7, 14, or 19 in Herron's Original Motion. (*See generally* Mot.; Claim Five.) The Amended Motion therefore "asserts a new ground for relief supported by facts that differ in both time and type from those the original pleading set forth." *Mayle*, 545 U.S. at 650. As such, Herron's *Davis* claim does not relate back to his Original Motion and is untimely. *Id.* Moreover, even if the claim were timely, the Second Circuit has held that the crime underlying Herron's Section 924(c) convictions—New York Penal Law § 125.25(1)—*is* categorically a crime a violence. *Stone v. United States*, 37 F.4th 825, 832-33 (2d Cir. 2023). Thus, Herron's *Davis* claim also fails on the merits.

---

[6] Count 7 corresponds to the murder of Frederick Brooks, Count 14 corresponds to the murder of Richard Russo, and Count 19 corresponds to the murder of Victor Zapata. (S-6 at 10-19.)

Next, in both his Original and Amended Motions, Herron argues that the Government withheld certain material evidence from the defense in violation of *Brady v. Maryland*, 373 U.S. 83 (1963). (Mot. at 6; Am. Mot. at 3.) In his Original Motion, Herron argues:

> Brian Delamore a government informant advised several people that Gonzales a Government witness against plaintiff, was trying to hire him to [] kill someone while incarcerated. The governement [sic] is said to have the tape of the incident and covered it up and made the case go away so Plaintiff and his lawyers did not have it for use on cross-examination. And, further, a murder of Damien Bowles took place at Douglas Street Pool on or about August 28, 2008. The Government never disclosed that they arrested and convicted someone for the murder.

(Mot. at 6.) Additionally, in his Amended Motion, Herron contends that the Government withheld "material evidence that Vincent Winfield either killed or was suspected of killing James Sykes at Douglas Street Pool in or around November 2008." (Am. Mot. at 3.) Herron asserts that this information was "never provided to petitioner to date" and is exculpatory because it establishes that Winfield "had a motive to curry favor with authorities" and "would lie, steal and cheat to get a deal." (*Id.*)

Herron's *Brady* claims are likewise procedurally barred. Even assuming that the *Brady* claims in the Amended Motion relate back to the Original Motion, the claims are nonetheless procedurally defaulted because they could have been, but were not, raised on direct appeal. *Thorn*, 659 F.3d at 231. And Herron does not establish "cause for the procedural default," nor does he allege "actual innocence" or a "complete miscarriage of justice" on the basis of these alleged violations. *Thorn*, 659 F.3d at 231; *Cuoco*, 208 F.3d at 30. As such, Herron cannot bring these *Brady* claims in his Section 2255 Motion.

Third, in his Original Motion, Herron argues that the Government's warrantless collection of certain cell-site evidence violated the Fourth Amendment and, therefore, the court should have suppressed that evidence. (Mot. at 9.) The Second Circuit considered and rejected this argument on direct appeal; as such, Herron may not relitigate it in his Section 2255 Motion. *Herron,* 762 F. App'x at 30-31; *Pitcher,* 559 F.3d at 123 ("[A] § 2255 [motion] cannot be used to relitigate questions which were raised and considered on direct appeal.").

Fourth and finally, in his Amended Motion, Herron argues that his life sentences for offenses committed while he was a minor[7] violate the Eighth Amendment. (Am. Mot. at 6-10 (citing *Roper v. Simmons,* 543 U.S. 551 (2005), *Graham v. Florida,* 560 U.S. 48 (2010), and *Miller v. Alabama,* 567 U.S. 460 (2012)).) Herron was born on March 30, 1982. (Defense Sentencing Submission (Dkt. 623-2) at 1.) Of the 21 counts of conviction, Herron received life sentences on 12 counts. (Judgment at 4.) Of those 12 counts, 3 alleged acts that occurred when Herron was under 18 years old:[8] Count 1 alleged racketeering based on seven[9] predicate racketeering acts, one of which included the cocaine base distribution conspiracy charged in Count 3; Count 2 alleged a racketeering conspiracy from January 1998 to October 2010; and

---

[7] For Eighth Amendment purposes, a "minor" or "juvenile" is someone who was under 18 years old at the time of the offense. *United States v. Sierra,* 933 F.3d 95, 97 (2d Cir. 2019).

[8] The court notes that Counts 5, 6, and 8 contain charges related to the murder of Frederick Brooks on June 16, 2001—when Herron was just 19 years old. (S-6 at 10-13.) However, the court does not consider these counts in the context of Herron's Eighth Amendment challenge because, when it comes to the age of a defendant, "a line must be drawn, and the Supreme Court has repeatedly chosen in the Eighth Amendment context to draw that line at the age of 18." *Sierra,* 933 F.3d at 97.

[9] Count 1 actually included nine predicate racketeering acts; however, the Government did not submit racketeering acts two or eight to the jury. (Original Sixth Superseding Indictment at 4-8; Gov't Opp. at 2 n.1.)

Count 3 alleged a conspiracy to distribute cocaine base from January 1998 to October 2010. (S-6 at 4-10.) Herron argues that his "12 life sentences based on juvenile and adolescent offenses" violate the Eighth Amendment, and that the "spill over prejudice Herron suffered by being charged as a juvenile and adult in the same conspiracy requires this court to vacate all the charges and try them separately." (Am. Mot. at 10.)

Herron's Eighth Amendment claim is procedurally barred. Herron raised the Eighth Amendment issue for the first time in his Amended Motion, 1.5 years after his timely Original Motion. (Am. Mot. at 6-10; *see generally* Mot.; Claim Five.) There is no mention of this issue in Herron's Original Motion. (*See generally* Mot.; Claim Five.) Thus, because the Amended Motion "asserts a new ground for relief supported by facts that differ in both time and type from those the original pleading set forth," Herron's Eighth Amendment claim is untimely. *Mayle,* 545 U.S. at 650. Moreover, Herron's claim is further barred because it could have been, but was not, raised on direct appeal. *Thorn,* 659 F.3d at 231. The Supreme Court decided *Roper, Graham,* and *Miller* in 2005, 2010, and 2012, respectively. Herron docketed his notice of appeal to the Second Circuit on April 8, 2015. (*See* Notice of Appeal (Dkt. 624).) Herron could have, but did not, raise this Eighth Amendment issue in his direct appeal. And Herron does not establish "cause for the procedural default," nor does he allege "actual innocence" or a "complete miscarriage of justice" on the basis of this alleged violation. *Thorn,* 659 F.3d at 231; *Cuoco,* 208 F.3d at 30. As such, Herron's Eighth Amendment claim is procedurally defaulted because it is untimely and because it could have been, but was not, raised on direct appeal.

### B.  Actual Innocence

In both his Original and Amended Motions, Herron argues that newly discovered evidence in the form of two witness affidavits undermine the integrity of his conviction. (Mot. at 8; Am. Mot.

at 3-4, 10-11.) For the reasons that follow, Herron's actual innocence claim fails.

### 1.    Applicable Law

"Where a defendant has procedurally defaulted a claim by failing to raise it on direct review, the claim may be raised in habeas only if the defendant can first demonstrate either cause and actual prejudice, or that he is actually innocent." *Bousley v. United States*, 523 U.S. 614, 622 (1998); *Thorn*, 659 F.3d at 231. To demonstrate actual innocence in a habeas proceeding, a defendant must present "new reliable evidence that was not presented at trial," and must "show that it is more likely than not that no reasonable juror would have found him guilty beyond a reasonable doubt." *Lucidore v. New York State Div. of Parole*, 209 F.3d 107, 114 (2d Cir. 2000). In other words, the defendant "bears a heavy burden of convincing the court that the newly-discovered evidence would have resulted in an acquittal." *United States v. Quashie*, Nos. 14-CR-376 (BMC), 18-CV-3740 (BMC), 2018 WL 5113136, at *3 (E.D.N.Y. Oct. 19, 2018). "Newly discovered" evidence is "evidence that is discovered after the original hearing, and which could not, with due diligence of counsel, have been discovered sooner." *Giacalone v. United States*, 739 F.2d 40, 43 (2d Cir. 1984).

### 2.    Discussion

In his Original Motion, Herron argues that newly discovered evidence in the form of an affidavit from "Mr. McFadden" shows that Government witness Saquan Wallace lied under oath when he testified that Herron introduced him to the criminal lifestyle. (Mot. at 8.) According to Herron, Mr. McFadden "swears under oath that he, not [Herron], raised Mr. Wallace and introduced him to the criminal lifestyle." (*Id.*)

In his Amended Motion, Herron argues that newly discovered evidence in the form of affidavits from Shanduke McPhatter and

Diane Flowers undermine Herron's conviction. (Am. Mot. at 3-4, 10-11.) Specifically, McPhatter states that:

> I was present during [trial] and heard the testimony of Saquan Wallace who lied during the trial. . . . The lie in question was that [Wallace] had a relationship with [Herron] where they were working together and [Herron] was supplying drugs and/or committing criminal acts with him. . . . I readily admit that was not the truth, in fact Saquan Wallace and his brother Kaywan Wallace [were] running with me [McPhatter] and not a part of any criminal acts allegedly committed by Ronald Herron. . . . It is my statement that Saquan Wallace was not committing crimes with [Herron] at all. His testimony that he was is a lie. Saquan was hanging with me on a daily basis and not with [Herron].

(McPhatter Affidavit[10] (Dkt. 800-1) ¶¶ 1-4.)

Additionally, Flowers states that she was prepared to testify that Herron "never brought any guns to my house and they never found any guns." (Flowers Affidavit (Dkt. 796-3) ¶ 7.) Flowers contends that Herron's attorney, Robert Soloway, caused her to fear that she might be prosecuted if she testified on Herron's behalf, and that Mr. Soloway provided her with an attorney who told her that Mr. Soloway said she could "still [get] on the stand as a witness but to plead the fifth to everything." (*Id.* ¶¶ 6-12.) Ultimately, Flowers "decided not to testify [out] of fear of retaliation." (*Id.* ¶ 15.)

At the outset, the court notes that "Mr. McFadden," mentioned in Herron's Original Motion, and Shanduke McPhatter, mentioned in Herron's Amended Motion, appear to be the same person. (*See* Mot. at 8; McPhatter Affidavit at 1.) According to the Original Motion, McFadden swears "that he, not [Herron],

---

[10] The McPhatter Affidavit was not signed before an authorized notary. (McPhatter Affidavit at 1.)

raised [Saquan] Wallace and introduced him to the criminal life-style." (Mot. at 8.) McPhatter similarly swears that Saquan Wallace "was running with me and not a part of any criminal acts allegedly committed by Ronald Herron." (McPhatter Affidavit at 1.) Given the similarity of their statements, the court assumes that McFadden and McPhatter are the same person.

Turning to the substance, the court concludes that the McPhatter Affidavit does not constitute "newly discovered evidence" and, even if it did, it would not have resulted in an acquittal. As the Government points out, McPhatter states that he was "present during the [trial]," "heard the testimony of Saquan Wallace," and was willing to testify about the facts alleged in his affidavit. (*Id.* at 1.) Additionally, in his Original Motion, Herron argues that trial counsel rendered ineffective assistance by "fail[ing] to call Mr. McFadden who was readily available and could have pro-vided evidence that [S]aquan Wallace committed perjury at the trial." (Claim Five.) Thus, this evidence was either known to counsel at the time of Herron's trial or could have been discov-ered with due diligence. For that reason, the court concludes that the McPhatter Affidavit is not "newly discovered" evidence. *See Giacalone*, 739 F.2d at 43 ("Newly discovered" evidence is "evi-dence that is discovered after the original hearing, and which could not, with due diligence of counsel, have been discovered sooner.").

Nor does the McPhatter Affidavit undermine Herron's conviction. Saquan Wallace entered into a cooperation agreement with the Government and testified at trial over the course of two days. (*See* Trial Tr. 5/28/2014 (Dkt. 599-1) at 946:1-1082:9; Trial Tr. 5/29/2014 (Dkt. 599-2) at 1106-1147.) Wallace testified that his "circle" consisted of, among others, his brother, drug dealer Omar Ransom, Shanduke McPhatter, and Herron. (Trial Tr. 5/28/2014 at 954:1-955:9, 1003:1-22 (describing Herron as "like a brother to me"), 949:22-950:3; Opp. at 23 (noting that

McPhatter was also known as "Trife").) According to Wallace, the individuals within this circle understood that "my gun was your gun[,] and if I could help you in any way [] I would be there for you." (Trial Tr. 5/28/2014 at 1003:14-20.) Wallace testified that he knew of Herron's drug dealing based on, among other things, the fact that Wallace purchased drugs from Herron "two [or] three times" and that Wallace accompanied Herron to collect drug proceeds from dealers on approximately three occasions. (*Id.* at 1005:16-1014:11.) Additionally, Wallace and Herron would sometimes supply one another with guns, and Wallace provided Herron a place to lay low after the murder of Frederick Brooks. (*Id.* at 1016:4-1027:3.) However, while Wallace knew that Herron was associated with the Murderous Mad Dogs, he himself never became a gang member. (*Id.* at 1003:21-1005:15.)

McPhatter's bald assertion that Wallace "lied during the trial" and was "not a part of any criminal acts allegedly committed by Ronald Herron" does not cause the court to lack confidence in the outcome of the trial. Even if the court considered the McPhatter Affidavit reliable, it does not undermine any specific trial testimony offered by Wallace.[11] Moreover, the court is satisfied that, even if McPhatter had testified and cast doubt on Wallace's truthfulness, the evidence against Herron was overwhelming and in no way hinged exclusively on Wallace's testimony. As such, the court is confident that McPhatter's testimony, if offered, would not have resulted in an acquittal. *Quashie,* 2018 WL 5113136, at

---

[11] In his Amended Motion, Herron states that "Mr. McPhatter went on record to state that [Herron] and Mr. Wallace were enemies, and Mr. Wallace lied during his testimony with regard to [Herron] to get back at him for disputes they had while in the streets." (Am. Mot. at 4.) These allegations are not reflected in McPhatter's Affidavit. (*See* McPhatter Affidavit.) Nor do they impact the court's conclusion that the admission of McPhatter's testimony would not have resulted in an acquittal.

*3 (explaining that the defendant "bears a heavy burden of convincing the court that the newly-discovered evidence would have resulted in an acquittal").

The court likewise concludes that the Flowers Affidavit does not constitute "newly discovered evidence" and, even if it did, it would not have resulted in an acquittal. First, the court notes that the Second Circuit considered a version of this claim on direct appeal, where Herron argued that the court violated his Sixth Amendment right to compulsory process by permitting Flowers to invoke her Fifth Amendment privilege "without adequate inquiry into the basis of [her] claim of privilege." *Herron*, 762 F. App'x at 28. The Second Circuit rejected Herron's claim, reasoning:

> As to Flowers, Herron's Sixth Amendment claim was waived. On advice of counsel, Flowers indicated that she would not appear voluntarily and she would invoke the Fifth Amendment in response to any questions inquiring into a privileged subject area. Herron's counsel indicated on the record that it was not his "intention to put [Flowers] on the stand under subpoena" and it was his understanding "that [as to] the specific questions [defense counsel was] going to put to her," *i.e.,* "whether or not she received a gun [or] handed guns to somebody else, that she would invoke the Fifth Amendment with respect to those questions." G. App. at 127. On that basis, counsel for Herron indicated that he was "finish[ed] with that witness." *Id.* Herron never attempted to subpoena Flowers. Therefore, he cannot now complain that he was denied process to compel Flowers to testify.

*Id.* at 29. Because the issues surrounding Flowers's decision not to testify were known to counsel at the time of Herron's trial, the Flowers Affidavit is not "newly discovered" evidence. *See Giacalone*, 739 F.2d at 43 ("Newly discovered" evidence is "evidence

that is discovered after the original hearing, and which could not, with due diligence of counsel, have been discovered sooner.").

Nor does the Flowers Affidavit undermine Herron's conviction. In fact, Herron does not even argue that the Flowers Affidavit serves as a basis for his acquittal. (*See* Am. Mot. at 10-11.) Instead, Herron argues that the Government and defense counsel "shook Ms. Flowers up with a cloud over her head[,] letting her know that she could be prosecuted if she testified as a defense witness." (*Id.* at 11.) As noted by the Government, Flowers's account of events is belied by the trial record, which reveals that *the court*, not Mr. Soloway, appointed attorney Michael Hueston to meet with Flowers and advise her of her rights. (Trial Tr. 6/16/2014 (Dkt. 591) at 3035:12-18.) After said meeting, Flowers decided to invoke her Fifth Amendment privilege. (Trial Tr. 6/17/2014 (Dkt. 593) at 3098:6-3101:17.) Far from the portrait of intimidation painted in Flowers's Affidavit, the trial record reflects a careful navigation by all parties of a particularly sensitive issue—a person's right against self-incrimination. Moreover, even if the court accepted Flowers's version of events, it in no way undermines Herron's conviction. At most, the Flowers Affidavit rebuts testimony that Flowers helped to cover up a particular crime. (Flowers Affidavit ¶¶ 6-7.) Thus, the court is confident that Flowers's testimony, if offered, would not have resulted in an acquittal. *Lucidore*, 209 F.3d at 114 ("In order to demonstrate actual innocence in a so-called collateral proceeding, a petitioner must present new reliable evidence that was not presented at trial and show that it is more likely than not that no reasonable juror would have found him guilty beyond a reasonable doubt.").

## C.   The Ineffective Assistance of Counsel Claims

In both his Original and Amended Motions, Herron argues that trial and appellate counsel rendered ineffective assistance in numerous respects. (Mot. at 5; Claim Five; Am. Mot. at 4-6.) For

the reasons that follow, Herron's ineffective assistance of counsel claims fail.

### 1.  Applicable Law

To prevail on a claim of ineffective assistance of counsel, a defendant must prove: (1) deficient performance and (2) prejudice. *Strickland v. Washington*, 466 U.S. 668, 687 (1984). Counsel is deficient when their representation "fell below an objective standard of reasonableness," and a defendant is prejudiced when "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Rosario v. Ercole*, 601 F.3d 118, 123 (2d Cir. 2010). A "reasonable probability" is "a probability sufficient to undermine confidence in the outcome." *Id.* Additionally, in assessing prejudice, the court considers the cumulative effect of the errors committed by counsel. *Lindstadt v. Keane*, 239 F.3d 191, 199 (2d Cir. 2001).

### 2.  Discussion

In his Original Motion, Herron argues that trial counsel rendered ineffective assistance by: (1) failing to argue that the Government "violated the bribery statute [12] by providing deals to unreliable murderers and drug dealers to testify"; (2) stipulating to the admissibility of a firearm; (3) neglecting to raise an objection to the Government's withholding of *Brady* material; and (4) "fail[ing] to call Mr. McFadden who was readily available and could have provided evidence that [S]aquan Wallace committed perjury at trial." (Mot. at 5; Claim Five.) In his Amended Motion, Herron reiterates his argument that trial counsel rendered ineffective assistance by "fail[ing] to object or move to preclude the Government from calling witnesses that only testified because

---

[12] The court presumes, based on the arguments raised in Herron's Amended Motion, that Herron refers to the federal anti-bribery statute, 18 U.S.C. § 201(c)(2). (*See* Am. Mot. at 4-6.)

the Government bribed witnesses by providing deals to unreliable murderers and drug dealers." (Am. Mot. at 4-6.) Herron does not expand on any of the other ineffective assistance claims from his Original Motion in his Amended Motion. The court addresses each argument in turn.

First, in his Original and Amended Motions, Herron argues that trial counsel rendered ineffective assistance by "fail[ing] to object or move to preclude the Government from calling witnesses that only testified because the Government bribed witnesses by providing deals to unreliable murderers and drug dealers." (Am. Mot. at 4-6; *see also* Claim Five) Specifically, Herron argues that two statutes "make it illegal to promise incentives for testimony from witnesses": the federal anti-bribery statute, 18 U.S.C. § 201(c)(2), and the obstruction statute, 18 U.S.C. § 1510. (*Id.*) These statutes prohibit, respectively, the making of bribes in exchange for testimony and the making of bribes in an effort to obstruct, delay, or prevent communication of information relating to a violation of the federal criminal laws. 18 U.S.C. § 201(c)(2); 18 U.S.C. § 1510(a). Herron argues that the Government's cooperation agreements with nine witnesses violated these statutes, and that trial counsel rendered ineffective assistance by failing to raise this argument at trial. (Am. Mot. at 5-6.)

Herron's bribery claim is meritless. It is well-established that the federal anti-bribery statute, 18 U.S.C. § 201(c)(2), "does not apply to the United States or to any federal prosecutor acting in his or her official capacity." *United States v. Bryce*, 208 F.3d 346, 350 n.3 (2d Cir. 1999); *see also United States v. Stephenson*, 183 F.3d 110, 118 (2d Cir. 1999). The court concludes that these precedents apply with equal force to the obstruction statute, 18 U.S.C. § 1510. Just as Congress could not have intended Section 201 to apply to the United States or federal prosecutors acting in their official capacity, the court concludes that Congress could not

18

have intended Section 1510, an anti-bribery and obstruction stat-
ute, to apply to the United States or federal prosecutors acting in
their official capacity and effectively prohibit Government coop-
eration agreements. *See United States v. Singleton*, 165 F.3d 1297,
1299 (11th Cir. 1999); *Stephenson*, 183 F.3d at 118 (agreeing
with the reasoning from *Singleton*). The court is confident that,
had trial or appellate counsel raised these arguments with re-
spect to Sections 201 and 1510, they would have been rejected.
As such, counsel's "failure to make a meritless argument does not
rise to the level of ineffective assistance." *United States v. Kirsh*,
54 F.3d 1062, 1071 (2d Cir. 1995). For that reason, this aspect
of Herron's ineffective assistance of counsel claim fails on the first
prong of *Strickland. See Strickland*, 466 U.S. at 697 (explaining
that a court need not address both prongs of the *Strickland* test;
if either fails, the entire claim fails).

Second, in his Original Motion, Herron argues that trial counsel
rendered ineffective assistance by stipulating to the admissibility
of a firearm. (Claim Five.) Specifically, Herron states that "[t]rial
counsel stipulated to evidence of a gun being admissible that the
firearm was from a Mr. Herron where the jury could have specu-
lated that petitioner or someone known to be petitioner like a
family member supplied the weapon to Mr. Winfield." (*Id.*) That
is the entirety of Herron's argument on this point. Although it is
unclear from Herron's Motion, the court assumes that Herron re-
fers to Government Exhibit 852, the .22 firearm recovered from
Vincent Winfield on December 21, 2008, which Winfield pos-
sessed during the September 13, 2008 attempted murder of
Kendale "Smurf" Robinson. (Trial Tr. 6/17/2014 (Dkt. 593) at
3159:23-3161:5; Trial Tr. 6/4/2014 (Dkt. 590) at 1835:15-
1870:13, 1903:13-1913:16, 1949:3-1952:5.) The parties stipu-
lated to the admissibility of that firearm as follows:

> It is hereby stipulated and agreed by and between the United
> States of America . . . and the defendant Ronald Herron by

his attorneys . . . that: One black .22 caliber Lorcin semiau-
tomatic firearm, with a defaced serial number, marked as
Government's Exhibit 852 . . . which was recovered from Vin-
cent Winfield . . . on December 21, 2008, was tested by
firearms experts from the New York Police Department la-
boratory firearms analysis section and found to be operable.
If called to testify, an expert in the determination of inter-
state nexus of firearms would testify that the black .22
caliber Lorcin semiautomatic firearm, with the defaced serial
number, marked as Government's Exhibit 852, recovered
from Vincent Winfield, . . . was manufactured outside of the
State of New York and was first purchased by an individual
identified as Paul Francis Herron at Carter's Guns and
Ammo, 163 Applewood Drive, Danville, Virginia 24541 and,
therefore, traveled in and affected, impacted interstate com-
merce. This stipulation, which has been marked for
identification as Government's Exhibit 852-ST, is admissible
as evidence as trial in this case.

(Trial Tr. 6/17/2014 at 3159:25-3160:25.)

Trial counsel's stipulation to the admissibility of Government Ex-
hibit 852 and other firearms does not "fall below an objective
standard of reasonableness." *Rosario*, 601 F.3d at 123. As evi-
denced in the above quotation, had defense counsel refused to
enter into a stipulation, the Government would have been able
to prove the same facts via witness testimony. Moreover, Win-
field himself testified that he obtained the .22 from Herron, albeit
with numerous intermediaries. (Trial Tr. 6/4/2014 at 1949:3-
1952:5.) Thus, counsel's failure to raise a fruitless argument
against the admissibility of this and other firearms evidence does
not rise to the level of ineffective assistance of counsel. *See Kirsh*,
54 F.3d at 1071 (explaining that "failure to make a meritless ar-
gument does not rise to the level of ineffective assistance"). As

such, this aspect of Herron's ineffective assistance of counsel claim fails on the first prong of *Strickland*.

Third, in his Original Motion, Herron argues that trial counsel rendered ineffective assistance "due to the Government's failure to provide Brady material in a timely manner that would have caused defense counsel to prepare and strategize from a different point when cross-examining key witnesses for the government." (Claim Five.) That is the entirety of Herron's argument on this point. The court presumes, though it is not entirely clear, that Herron means to argue that his counsel was ineffective for failing to raise the *Brady* claims addressed in his Original and Amended Motions. (*See* Mot. at 6; Am. Mot. at 3.) As a reminder, in his Original Motion, Herron argues that "Brian Delamore a government informant advised several people that Gonzales a Government witness against plaintiff, was trying to hire him to [] kill someone while incarcerated," and the Government "is said to have the tape of the incident and covered it up and made the case go away so Plaintiff and his lawyers did not have it for use on cross-examination." (Mot. at 6.) Additionally, in his Original and Amended Motions, Herron contends that the Government withheld "material evidence that Vincent Winfield either killed or was suspected of killing James Sykes at Douglas Street Pool in or around November 2008." (Am. Mot. at 3.) Herron asserts that this information was "never provided to petitioner to date" and is exculpatory because it establishes that Winfield "had a motive to curry favor with authorities" and "would lie, steal and cheat to get a deal." (*Id.*)

The Government, in the context of opposing Herron's *Brady* claim, argues that Herron's *Brady* claim is meritless. (Gov't Opp. at 25.) The Government points out that Herron "provides no basis for his accusation that Winfield was complicit in the November 2008 murder of James Sykes," and states that a review of the Government's investigative file "reveals no indication that

21

Winfield was suspected of having killed James Sykes or received immunity for murdering James Sykes." (*Id.*) Herron does not contest this assertion in his Reply. (*See generally* Reply.) Furthermore, even if Winfield was involved in the murder of Sykes, the Government argues it is unlikely that fact would have affected the jury's verdict. (*Id.* at 26.) Winfield "testified extensively about his criminal conduct, generally, and his specific criminal offenses committed in furtherance of Herron's Enterprise, including racketeering, conspiracy to distribute narcotics, armed robbery and attempted murder. . . . [and] his numerous acts of serious violence." (*Id.*) Nevertheless, the jury apparently credited Winfield's testimony against Herron. Thus, the Government argues that the additional fact of Winfield's alleged murder of Sykes would not have caused the jury to discredit him or changed the result of the trial. (*Id.*)

"There are three components of a true *Brady* violation: The evidence at issue must be favorable to the accused, either because it is exculpatory, or because it is impeaching; that evidence must have been suppressed by the [Government], either willfully or inadvertently; and prejudice must have ensued." *Strickler v. Greene*, 527 U.S. 263, 281-82 (1999); *see also Brady v. Maryland*, 373 U.S. 83, 87 (1963) (Government must disclose exculpatory material to defense); *Giglio v. United States*, 405 U.S. 150, 154 (1972) (under *Brady*, Government must disclose impeachment material to the defense). Prejudice is established when "there is a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different." *Strickler*, 527 U.S. at 280.

Trial and appellate counsel were not ineffective for failing to assert a *Brady* claim based on the Government's alleged failure to disclose impeaching evidence as to Vincent Winfield and Rafael Gonzalez. Even assuming that the evidence was favorable to Herron and that the Government suppressed it, Herron suffered no

prejudice. Thus, this aspect of Herron's ineffective assistance of counsel claims fails on the second prong of *Strickland*.

As established at trial, Winfield was a member of the Bloods and an enforcer in Herron's drug distribution enterprise. (Trial Tr. 6/4/2014 at 1768:1-19, 1815:11-23.) Winfield testified that he started selling crack with Rafael "Feo" Gonzalez when he was 13, and that his first run-in with the law occurred at 14 years old, when he was arrested for throwing bricks at cars "just for fun." (*Id.* at 1970:10-1974:21; Trial Tr. 6/2/2014 (Dkt. 609) at 1457:11-14.) He testified about his criminal conduct in general, and specific criminal offenses committed in furtherance of Herron's drug distribution enterprise, including racketeering, conspiracy to distribute narcotics, armed robbery, and attempted murder, including the attempted murder of Kendale "Smurf" Robinson. (Trial Tr. 6/4/2014 at 1767:16-1768:18, 1779:15-1780:25; 1804:24-1806:22; 1814:7-1829:24; 1835:15-1870:13.) Indeed, Winfield testified from federal prison, where he was incarcerated following his conviction for racketeering, attempted murder, and other offenses committed on behalf of Herron. (*Id.* at 1767:3-20; 1959:2-4.) Defense counsel thoroughly cross-examined Winfield regarding his history, numerous acts of violence, and the fact that he testified pursuant to a cooperation agreement. (*Id.* at 1970:1-1997:10; Trial Tr. 6/5/2014 (Dkt. 613) at 2011:12-2054:14.) Despite his criminal history and cooperation agreement, the jury apparently credited Winfield's testimony, finding Herron guilty on all counts of the Superseding Indictment, including Racketeering Act 6, the attempted murder of "Smurf" Robinson. (S-6 at 6-7; Verdict Sheet (Dkt. 578) at 2.)

Given Winfield's extensive testimony regarding his criminal history, the court concludes that additional cross-examination concerning the murder of James Sykes would have been "cumulative . . . [such] that it would not have materially increased the

23

jury's likelihood of discrediting [Winfield]." *United States v. Spinelli*, 551 F.3d 159, 165 (2d Cir. 2008). Impeachment evidence is "less likely to be considered material when it merely furnishes an additional basis on which to impeach a witness whose credibility has already been shown to be questionable." *Id.* The jury knew that Winfield was capable of violent acts, including attempted murder, and that he testified pursuant to a cooperation agreement. Thus, even if Winfield did murder James Sykes and the Government withheld that information from defense counsel, that impeachment evidence is immaterial because it "would not have materially increased the jury's likelihood of discrediting [Winfield]." *Id.* For that reason, Herron suffered no prejudice from trial and appellate counsel's failure to assert a *Brady* claim on this ground.

Herron's *Brady* claim as to Rafael Gonzalez likewise fails. Like Winfield, Gonzalez testified from federal prison, where he was incarcerated following his conviction for homicide, drug trafficking, and other offenses committed alongside Herron. (Trial Tr. 6/2/2014 at 1445:5-1446:13.) Gonzalez testified about his criminal conduct in general, and specific criminal offenses committed in furtherance of Herron's drug distribution enterprise, including his participation in the murder of Richard Russo. (*Id.* at 1450:8-1454:5, 1488:13-1514:11.) Gonzalez also testified that he met a man in prison named "Top" who offered to kill or harm the individuals responsible for the attempted rape of Gonzalez's girlfriend. (*Id.* at 1515:6-1518:17.) Although Top ultimately did not harm anyone, Gonzalez testified at length about his consideration of Top's offer, both on direct and cross-examination. (*Id.*; Trial Tr. 6/3/2014 (Dkt 588) at 1564:18-1571:5.) Defense counsel thoroughly cross-examined Gonzalez regarding his history and the fact that he testified pursuant to a cooperation agreement with the Government. (Trial Tr. 6/2/2014 at 1522:1-1528:12; Trial Tr. 6/3/2014 at 1559:21-1631:20.) Ultimately,

the jury apparently credited Gonzalez's testimony, finding Herron guilty on all counts of the Superseding Indictment, including Racketeering Act 5, Count 12, Count 13, and Count 15, all relating to the murder of Richard Russo. (S-6 at 6-17; Verdict Sheet at 2; Judgment at 1.)

Given Gonzalez's extensive testimony regarding his criminal history, the court concludes that additional cross-examination concerning his alleged attempt to hire a Government informant to kill someone would have been "cumulative . . . [such] that it would not have materially increased the jury's likelihood of discrediting [Gonzalez]." *Spinelli*, 551 F.3d at 165. First, to the extent Herron refers to Top's offer to kill or harm the individuals who attempted to rape Gonzalez's girlfriend, the parties explored that incident at length at trial. However, to the extent Herron refers to a separate incident where Gonzalez attempted to hire a hitman, the court concludes that such evidence is immaterial because it "merely furnishes an additional basis on which to impeach a witness whose credibility has already been shown to be questionable" *Id.* Even if Gonzalez did attempt to hire another hitman and the Government withheld that information from defense counsel, such impeachment evidence "would not have materially increased the jury's likelihood of discrediting [Gonzalez]." *Id.* For that reason, Herron suffered no prejudice from trial and appellate counsel's failure to assert a *Brady* claim on this ground.

Fourth and finally, Herron argues that trial counsel rendered ineffective assistance by "fail[ing] to call Mr. McFadden who was readily available and could have provided evidence that [S]aquan Wallace committed perjury at the trial." (Claim Five.)

Counsel's decision not to call McPhatter as a defense witness does not "fall below an objective standard of reasonableness." *Rosario*, 601 F.3d at 123. "The decision whether to call any witnesses on behalf of the defendant, and if so which witnesses to call, is a

25

tactical decision of the sort engaged in by defense attorneys in almost every trial." *United States v. Smith*, 198 F.3d 377, 386 (2d Cir. 1999). Such strategic decisions, "if reasonably made, cannot support an ineffective assistance claim." *United States v. Eisen*, 974 F.2d 246, 265 (2d Cir. 1992); *see also Greiner v. Wells*, 417 F.3d 305, 319 (2d Cir. 2005) (noting that "strategic choices made after thorough investigation of law and facts relevant to plausible options are virtually unchallengeable"). Herron does not allege that trial counsel failed to investigate McPhatter as a potential witness. (*See* Claim Five.) And the court concludes that counsel's decision not to call McPhatter as a witness falls within "the wide range of reasonable professional assistance." *Strickland*, 466 U.S. at 689 (noting that there is a "strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance"). As explained above, while McPhatter may have served to counter Wallace's narrative of his relationship with Herron, it is unlikely that McPhatter's testimony, if given, would have affected the outcome of the trial. Thus, this aspect of Herron's ineffective assistance of counsel claims fails on both prongs of *Strickland*.

### D.  The Motion for Discovery

Herron moves, pursuant to Rule 6 of the Rules Governing Section 2255 Proceedings, for an order compelling the Government to disclose certain discovery related to Point II of Herron's Amended Motion—the *Brady* claim. (Disco. Mot. at ¶ 2; Am. Mot. at 2-3.) Specifically, Herron requests that the Government "disclose the grand jury testimony, any and all investigative reports, whether NYPD DD5s or 302s, notes, and/or recordings, whether audio or video," related to the November 2008 homicide of James Sykes. (Disco. Mot. at ¶ 6.) The Government does not respond to Herron's motion for discovery, although it opposes Herron's *Brady* claims. (Gov't Opp at 25-26.)

26

Rule 6 of the Rules Governing Section 2255 Proceedings provides that a court "may, for good cause, authorize a party to conduct discovery under the Federal Rules of Criminal Procedure or Civil Procedure, or in accordance with the practices and principles of law." Rule 6(a) of the Rules Governing Section 2255 Proceedings. To show "good cause," the defendant must present "specific allegations" that give the court "reason to believe that [the defendant] may, if the facts are fully developed, be able to demonstrate that he is entitled to relief." *Bracy v. Gramley*, 520 U.S. 899, 908-09 (1997).

Herron has not shown good cause for discovery on his *Brady* claim. Even if Herron obtained evidence that proves what he claims—that Vincent Winfield either killed or was suspected of killing James Sykes and that the Government withheld this evidence from the defense—he would not be entitled to relief. For the reasons detailed above, the withholding of this impeachment evidence did not prejudice Herron because it ultimately would not have impacted the result of the trial. As such, there is no "reason to believe that [Herron] may, if the facts are fully developed, be able to demonstrate that he is entitled to relief." *Bracy*, 520 U.S. at 908-09. For that reason, Herron's motion for discovery is denied.

### E.    Request for a Hearing

Finally, there is no need for the court to conduct an evidentiary hearing on Herron's habeas motion. Section 2255 provides that the court need not conduct a hearing where "the motion and the files and records of the case conclusively show that the [defendant] is entitled to no relief." 28 U.S.C. § 2255(b); *Armienti v. United States*, 234 F.3d 820, 822-23 (2d Cir. 2000). As discussed above, the Motion and the files and records of this case conclusively show that Herron is entitled to no relief. Therefore, no hearing is required.

## IV. CONCLUSION

For the foregoing reasons, the Motion is DENIED, the Motion for Discovery is DENIED, and Herron's request for a hearing is DE-NIED. Because Herron has not made a substantial showing of the violation of a constitutional right, no certificate of appealability shall issue. The Clerk of Court is respectfully directed to enter judgment and close this case and the related civil case, No. 22-CV-2538.

SO ORDERED.


Dated:      Brooklyn, New York
            March 14, 2025

                                        s/Nicholas G. Garaufis
                                        ̶N̶ICHOLAS G. GARAUFIS
                                        United States District Judge